UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES COTTLE, et al., | Case No. 20-cv-03056-DMR |
| Plaintiffs, | |
| v. | **ORDER ON MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT** |
| PLAID INC., | |
| Defendant. | Re: Dkt. No. 137 |

This action consists of five separately-filed putative class actions in which 11 named plaintiffs allege that Defendant Plaid Inc. ("Plaid") uses consumers' banking login credentials to harvest and sell detailed financial data without their consent. The court consolidated the matters in July 2020. Plaintiffs now seek preliminary approval of a class action settlement. [Docket No. 137.] The court held a hearing on September 30, 2021 and ordered the parties to submit supplemental evidence in support of the motion, which they timely filed. [Docket Nos. 146-149.] For the following reasons, preliminary approval is granted.

## I.      BACKGROUND

### A.      Factual Allegations and Procedural History

Plaid is a tech startup in the financial technology or "fintech" industry. It provides bank "linking" and verification services for fintech apps that consumers use to send and receive money from their financial accounts, such as Venmo, Coinbase, Cash App, and Stripe. [Docket No. 61 (Consolidated Amended Class Action Complaint, "CFAC") ¶¶ 2, 32.] Plaintiffs are Caroline Anderson, James Cottle, Rachel Curtis, David Evans, Logan Mitchell, Alexis Mullen, Jordan Sacks, Frederick Schoeneman, Gabriel Sotelo, Jeffrey Umali, and Nicholas Yeomelakis. They are consumers in five states and the District of Columbia who linked their bank accounts to fintech apps using Plaid's software. CFAC ¶ 99. Plaintiffs allege that in connection with the linking and

United States District Court
Northern District of California

verification process, Plaid misled them and violated their privacy and the privacy of the putative class members by obtaining data from their financial accounts without authorization and by obtaining their bank login information through its user interface, known as "Plaid Link." According to Plaintiffs, Plaid designed the login screens in its interface to give them the look and feel of login screens used by individual financial institutions.  However, Plaintiffs allege, Plaid fails to disclose to its users that they are not actually interfacing with their bank.  *Id*. at ¶¶ 37-40. Plaintiffs further allege that by using the accumulated consumer bank login information, Plaid has collected a significant amount of consumer banking data that it routinely sells to third parties.  *Id*. at ¶¶ 48, 59-60.

Plaintiffs filed their original complaints in five separate lawsuits in May, June, and July 2020.  The court related the cases and subsequently consolidated them in one action, No. 20-cv-3056, *In re Plaid Inc. Privacy Litigation*, and granted the parties' request to appoint Interim Co-Lead Counsel and a Steering Committee.  [Docket No. 57.]  Pursuant to court order, Plaintiffs filed the CFAC on August 5, 2020.  [Docket No. 61.]

Plaid moved to dismiss the CFAC, and the court granted the motion in part and denied it in part on April 30, 2021.  *Cottle v. Plaid Inc.*, No. 20-CV-03056-DMR, ---F. Supp. 3d---, 2021 WL 1721177 (N.D. Cal. Apr. 30, 2021).  In relevant part, the court dismissed with prejudice Plaintiffs' claim for declaratory and injunctive relief as well as four statutory claims.  *Id*. at *23.  The remaining claims are: 1) invasion of privacy—intrusion into private affairs; 2) unjust enrichment (quasi-contract claim for restitution and disgorgement); 3) violation of Article I, Section I of the California Constitution; 4) violation of the California Anti-Phishing Act of 2005 ("CAPA"), California Business & Professions Code section 22948 *et seq*.; and 5) violation of California Civil Code sections 1709 and 1710.

Plaintiffs bring the first two claims on behalf of themselves and the following "Nationwide Class":

> All natural persons in the United States whose accounts at a financial institution were accessed by Plaid using login credentials obtained through Plaid's software incorporated in a mobile or web-based fintech app that enables payments (including ACH payments) or other money transfers, including without limitation users of Venmo,

> Square's Cash App, Coinbase, and Strike, from January 1, 2013 to the present.

*Id*. at ¶ 247.  In addition, Plaintiffs Cottle, Evans, Mitchell, Schoeneman, Sotelo, and Umali bring the third through fifth claims on behalf of themselves and the following "California class":

> All natural persons in California whose accounts at a financial institution were accessed by Plaid using login credentials obtained through Plaid's software incorporated in a mobile or web-based fintech app that enables payments (including ACH payments) or other money transfers, including without limitation users of Venmo, Square's Cash App, Coinbase, and Strike, from January 1, 2013 to the present.

*Id*. at ¶ 248.

### B.   Litigation History

Plaintiffs' counsel represent that they undertook several months of investigation into Plaid's business practices prior to filing the original complaint in this action.  [Docket No. 138 (Kennedy Decl., Aug. 5, 2021) ¶ 4.]  After filing the CFAC, Plaintiffs conducted discovery, including third-party discovery to banks.  *Id*. at ¶ 7.

The parties participated in private mediation before the Hon. Jay Gandhi (ret.) on February 16, 2021.  In preparation for the mediation, the parties submittted detailed mediation briefs and participated in a technology tutorial session with Judge Gandhi.  Plaintiffs also retained and worked with a financial analyst.  *Id*. at ¶ 10.  The parties did not reach a settlement agreement at the first mediation but continued to negotiate with Judge Gandhi's assistance.  *Id*. at ¶¶ 11-12. The parties participated in a second mediation session before Judge Gandhi on April 13, 2021. Following the second mediation, the parties continued their discussions.  On June 7, 2021, Judge Gandhi made a mediator's proposal for a class-wide settlement, which the parties accepted on June 11, 2021.  *Id*. at ¶¶ 13-14.  They executed a long-form settlement agreement on July 30, 2021.  *Id*. at ¶ 14, Ex. A (the "Settlement Agreement").

## II.   TERMS OF THE SETTLEMENT

### A.  Proposed Class

The proposed class consists of "all natural persons who reside in the United States and who own or owned one or more Financial Accounts at the time such persons resided in the United

States from January 1, 2013 to the date preliminary approval of the settlement is granted."
Settlement Agreement ¶ 19.  "Financial Account" is defined as "a financial institution account (1)
that Plaid accessed using the user's login credentials and connected to a mobile or web-based
fintech application that enables payments (including ACH payments) or other money transfers or
(2) for which a user provided financial account login credentials to Plaid through Plaid Link."  *Id.*
at ¶ 32.  The term "Financial Account does not include an account that was connected, or for
which credentials were provided, exclusively through an OAuth Process or Managed OAuth
Process."[1]  *Id.*

Plaid does not dispute that the proposed class meets the requirements for class certification
under Federal Rules of Civil Procedure 23(a) and 23(b)(2) for settlement purposes only.  Mot. 10-
11.

### B.      Payment Terms

Plaid agrees to pay $58 million (the "Settlement Amount") to create a non-reversionary
cash Settlement Fund for the benefit of Class Members.  Settlement Agreement ¶¶ 50, 71.  The
following will be deducted from the Settlement Amount: 1) any amounts approved by the court for
cost and fee awards and service awards; 2) escrow account tax liabilities and tax expenses; 3) costs
of providing notice under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715; and 4) costs
charged by the Settlement Administrator, including costs for disseminating notice to the Class
Members, processing claim forms, and performing services specified in the Settlement Agreement.
*Id.* at ¶ 78(a).  The remainder following those deductions constitutes the "Net Settlement Fund"
from which individual Class Members will be paid.  *Id.* at ¶ 78(a), (b).

The Net Settlement Fund will be distributed to Class Members via a claims-made pro rata
payment.  *Id.* at ¶ 78(b).  Specifically, the Settlement Administrator will distribute a monetary
payment to each Class Member who submits an "Approved Claim," defined as a claim form that is

---

[1] The Settlement Agreement defines "OAuth Process" to mean "a process through which Plaid
redirects an end user to the financial institution's domain to enter their login credentials and does
not obtain login credentials for the end user."  Settlement Agreement ¶ 38.  A "Managed OAuth
Process" is "a process through which Plaid obtains login credentials in order to secure an access
token pursuant to a formal agreement with the applicable financial institution and does not store
those login credentials."  *Id.* at ¶ 33.

United States District Court
Northern District of California

timely, complete, signed, and verified by the Settlement Administrator ("Authorized Claimants"). The payment will be via physical check, Automated Clearing House ("ACH") transfer, or deposit to a designated PayPal or Venmo account. *Id*. at ¶¶ 78(b)(iii), 15. Such payments will be distributed within 60 days after the Effective Date.[2] *Id*. at ¶ 78(b).

Authorized Claimants who receive a physical check will have 90 days after the date of issuance to cash the check.[3] Funds from checks that are not cashed within the 90-day period, funds from checks returned as undeliverable, and funds from failed ACH, PayPal, or Venmo transfers shall revert to the Settlement Fund. *Id*. at ¶ 78(b)(iv). Any such unclaimed funds will go through a second distribution to Authorized Claimants. In the event that the distribution "is not economically feasible," unclaimed funds will be distributed to *cy pres* recipients. *Id*. at ¶¶ 78(b)(iv), 84. Plaintiffs propose that funds be distributed to two *cy pres* recipients: 1) Privacy Rights Clearinghouse, which is "'a nonprofit organization protecting privacy for all by empowering individuals and advocating for positive change,' which 'strive[s] to provide clarity on complex topics by publishing extensive educational materials,'" and 2) Consumer Reports, which "evaluat[es] the privacy implications of digital technologies to provide consumers with information about security and privacy risks and further corporate accountability," and "design[s] and implement[s] tests to rate technology products, services, and platforms on their collection, use, and protection of consumer data, and to educate and empower consumers." Mot. 4-5. According to Plaintiffs, the work of these two organizations "has the requisite nexus to this action, the goals of the underlying statutes and claims, and the interests of this Class." *Id*. at 4 (citing *Lane v. Facebook*, 696 F. 3d 811, 819-20 (9th Cir. 2012)).

---

[2] The Settlement Agreement defines "Effective Date" as "the first date after which the following events and conditions have occurred: (a) the Court has entered a Final Judgment; and (b) the Final Judgment has become final in that the time for appeal or writ has expired or, if any appeal and/or petition for review is taken and the settlement is affirmed, the time period during which further petition for hearing, appeal, or writ of certiorari can be taken has expired. If the Final Judgment is set aside, materially modified, or overturned by the Court or on appeal, and is not fully reinstated on further appeal, the judgment shall not be a Final Judgment." Settlement Agreement ¶ 26.

[3] At the hearing on preliminary approval, Plaintiffs confirmed that the face of each check will state that it must be cashed within 90 days.

United States District Court
Northern District of California

C.      **Injunctive Relief**

Plaid agrees to implement a number of business practice changes that Plaintiffs contend will "remediate alleged privacy violations, improve user control over their private login information and financial data, and safeguard their privacy going forward." Mot. 5. Where any of the following provisions contemplate a change to Plaid's existing practice, Plaid will implement the change within 180 days from the Effective Date and will continue for a period of three years. Where a provision relates to the continuation of an existing practice, the commitment will continue for three years from the Effective Date. Settlement Agreement ¶¶ 64-65.

1.      **Data Deletion**

Plaid will delete data from its systems that was retrieved as part of Plaid's "Transactions" product for users that Plaid can reasonably determine did not connect an account to an application that requested Transactions data. Such data can include information about financial account activity, such as the amount, time, and place of deposits, withdrawals, transfers, or purchases. Settlement Agreement ¶ 63; Mot. 5. Plaid will also delete data from its systems for users for whom Plaid is aware that it no longer has valid means that can be used to authenticate with the financial institution. Settlement Agreement ¶ 63. For example, if Plaid determines that the password it obtained for a particular bank account has changed, or that the account has been closed, Plaid will delete the associated account data from its systems. Mot. 5.

2.      **Plaid Portal Disclosure**

The class notice will prominently disclose that users can create a Plaid Portal account, explain the user controls available through Plaid Portal, and provide the URL for Plaid Portal. Settlement Agreement ¶ 58. Plaid will ensure that there is "[a] prominent reference to Plaid Portal (currently available at my.plaid.com) on its website homepage, including a link to the Plaid Portal and a plain-language description of the user controls available on Plaid Portal." *Id*. at ¶ 54(a). According to Plaintiffs, a Plaid Portal account allows users to "view and manage the connections that have been made between apps and their financial accounts using Plaid" and to "delete their financial data stored in Plaid's systems." Mot. 6. Plaid also agrees to "take reasonable commercial efforts to send periodic email reminders to Plaid Portal account holders" describing

the controls available in Plaid Portal.  Settlement Agreement ¶ 59.

### 3. Disclosures at the Time of Account Connection

Plaid will ensure that its standard Plaid Link flow includes the following:

- The consent pane, where users agree to Plaid's End User Privacy Policy ("EUPP") and explains that Plaid will connect their application to their financial institution, will (1) refer expressly to Plaid and explain that Plaid is used to link the user's accounts; (2) include a conspicuous link to Plaid's EUPP; and (3) require the user to agree to Plaid's EUPP by taking clear affirmative action.

- The credentials pane, which is the pane where users enter their financial account username and password, will explain that the user's credentials are being "provided to Plaid."

- The background color of the credential pane will not utilize the color scheme associated with a specific financial institution for that financial institution.

Settlement Agreement ¶ 56.

### 4. Data Minimization

Plaid will minimize the data it stores from users' financial accounts as follows: with respect to data retrieved from users' financial accounts, Plaid will only store the categories of data for the Plaid product(s) that the user's application specifically requests from Plaid or that are necessary for Plaid to offer its services, unless the user has expressly consented to the retrieval of additional data fields.  Plaid will use its best efforts to continue to inform the applications that use Plaid about its "/item/remove endpoint," "which terminates the customer's access to data, and may lead to data deletion (if such data is not actively used by another customer)."  *Id.* at ¶¶ 60-62.

### 5. Enhancing Disclosures

Plaid will enhance its EUPP to provide more detailed information about Plaid's data collection, storage, use, sharing, and deletion practices.  The enhanced EUPP will:

- Provide more detail about the categories of personal information Plaid collects from users' financial accounts for each Plaid generally available product, including a plain-language list of the category or categories of personal information Plaid

collects and a plain-language statement of the general reasons it is collected.

- Provide more detail about how Plaid uses data, including by providing, for each category of personal information that Plaid collects about users, the categories of sources of the personal information; uses for which Plaid collects the information; and the categories of parties with whom Plaid shares personal information, if any.

- Provide a plain-language explanation of Plaid's deletion and retention practices related to personal information collected from users' financial accounts.

- Provide a dedicated section explaining in plain-language terms the privacy controls Plaid has made available to users, including instructions that explain how to navigate to the Data Protection Rights section of the EUPP and how users can exercise those rights.

Settlement Agreement ¶ 53.

### D.      Notice and Settlement Administration Costs

All settlement notice and administrative costs will be paid from the Settlement Fund, except that in the event such costs exceed approximately $5.5 million (which the parties state they do not presently anticipate), Plaid will pay for up to $500,000 of such additional administrative costs directly to the third-party administrator.  Settlement Agreement ¶¶ 17 n.2, 78(a), 96.  The proposed third-party administrator, Angeion Group LLC ("Angeion") explains that the estimated cost of sending notice to Class Members via email and US Mail varies based on the claims rate and the percentage of emailed notices that are unable to be delivered.  [Docket No. 149 (2d Weisbrot Decl., Oct. 7, 2021) ¶ 10.]

The parties agree to provide notice of the settlement to Class Members in accordance with a notice program administered by Angeion.  Settlement Agreement ¶ 94; Kennedy Decl. ¶¶ 27-28.  The proposed notice program is as follows: Plaid will provide Angeion with approximately 62 million unique email addresses for certain Class Members and mailing addresses for certain other Class Members.  [Docket Nos. 139 (Weisbrot Decl., Aug. 5, 2021) ¶ 14; 2d Weisbrot Decl.¶ 4.]  Angeion will send the notice via email to all potential Class Members for whom email addresses are provided.  Prior to distributing email notice, Angeion will engage in an email updating process

United States District Court
Northern District of California

1    to help ensure the accuracy of recipient email addresses.  Weisbrot Decl. ¶¶ 16, 18.  After

2    approximately 24-72 hours, Angeion will cause a second round of email noticing to any email

3    addresses that were identified as "soft bounces and not delivered."  *Id*. at ¶ 19.

4         For all Class Members for whom a mailing address is provided instead of an email address,

5    Angeion will update the mailing address information utilizing a national database.  *Id*. at ¶ 23.

6    Angeion will then send a postcard notice to these Class Members.  Notices returned with a

7    forwarding address will be re-mailed to the new address provided by the United States Postal

8    Service, and those notices returned without forwarding addresses will be subjected to an address

9    verification search.  Notices will be re-mailed to any new addresses identified in that process.  *Id*.

10    at ¶¶ 24-26.

11         Angeion will purchase digital advertisements, provide notice on social media, run a paid

12    search campaign, and sponsor class action website listings.  *Id*. at ¶¶ 27-41.  Additionally,

13    Angeion will create a case-specific website where Class Members can view general information

14    about the settlement, review relevant documents, and view deadlines pertinent to the settlement.

15    *Id*. at ¶ 43.

16         The Notice that will be emailed and mailed to Class members includes a description of the

17    lawsuit, including an overview of the allegations; a description of the class definition; and a

18    summary of the settlement amount and injunctive relief.  It informs Class Members that they must

19    submit a Claim Form in order to receive a payment and provides information about how to do so,

20    including information about the settlement website.  Weisbrot Decl. ¶¶ 16, 22, Exs. B, C

21    (Proposed Notice).  It also informs Class Members of their option to be excluded from the

22    settlement and states that they may object to the settlement, and notifies Class Members that they

23    may attend the final approval hearing on a date to be determined by the court.  *Id*.

24         In a supplemental declaration, Angeion President Steven Weisbrot explains that Plaid

25    currently estimates that it has approximately 62 million unique email addresses for certain Class

26    Members and approximately 62 million physical mailing addresses for certain Class Members.  2d

27    Weisbrot Decl. ¶ 4.  There are approximately 277,000 Class Members with mailing addresses and

28    no email addresses.  *Id*. at ¶ 9.  The cost of sending notice to the Class Members as described

above, including emailing notice to all Class Members with unique email addresses and mailing notice only to those Class Members with physical mailing addresses and no email addresses, is between $2,487,187 and $4,057,341, depending on the claims rate.  *Id*.[4]

### E.   Claim Form

In order to receive a monetary payment from the Settlement Fund, Class Members must submit a Claim Form by the Claims Deadline, which will be no later than 90 days after the date notice is substantially completed.  Settlement Agreement ¶¶ 18, 35, 78(b), 80, Ex. A (Claim Form).  The Claim Form may be submitted online or by U.S. mail.

For online submissions, the Claim Form provides a space for the claimant to enter the Notice ID and Confirmation Code listed on the personalized notice they received by mail or email. It asks the claimant to enter their contact information and mailing address and to select a payment option from three choices: PayPal, Venmo, or physical check mailed to the address provided on the Claim Form.  The claimant must then enter their digital signature and make the following attestation under penalty of perjury:

> By signing below and submitting this Claim Form, I hereby swear under penalty of perjury that I am the person identified above and the information provided in this Claim Form is true and correct, and that nobody has submitted another claim in connection with this Settlement on my behalf.

For online submissions by claimants who do not have a Notice ID and Confirmation Code, the claimant must provide their contact information and mailing address and select one of the three payment options described above.  In addition, they must complete a section entitled, "Other Information."  This section states the following:

> In this Settlement, you may be a Class Member if you own or owned an account at a financial institution that was connected to a mobile or web-based payments app or service through Plaid and/or for which

---

[4] According to the proposed administrator, the estimated cost of sending notice to all Class Members via U.S. Mail is between $27,956,668 and $29,526,822, depending on the claims rate. 2d Weisbrot Decl. ¶¶ 5-8.  The estimated cost of sending email notice to all Class Members with email addresses, mail notice to Class Members with mailing addresses only, and mail notice to Class Members to whom email notices cannot be delivered is between $3,585,252 and $6,229,000, depending on the claims rate and the percentage of emailed notices that cannot be delivered.  *Id*. at ¶ 10.

United States District Court
Northern District of California

1

2

> account credentials were provided through Plaid Link, between January 1, 2013 and [date of preliminary approval], as further explained and defined in the Class notice materials, which you should review carefully.

3

4

5

6

> If, based on the information provided in the Class notice materials, you believe you are a Class Member, please provide the following information about at least one, and up to eight, of the connections between your financial account(s) and mobile or web-based app(s) or service(s).   Please include only one financial institution, app or service, per row:

A chart appears under the information above that provides space to list up to eight financial

7

institutions where the individual owns or owned a financial account; the name of the app or

8

service the individual connected to the financial institution; and the approximate date of the

9

connection.  The claimant must then make the attestation described above by entering their digital

10

signature.

11

Claimants may also submit paper Claim Forms by mail.  The paper Claim Forms ask the

12

claimant to provide the same information set forth above; that is, if the claimant has a Notice ID,

13

the Claim Form asks for their contact information, mailing address, and email address, as well as

14

selection of one of the three payment options.  If the claimant selects PayPal or Venmo, they must

15

enter the email address and/or mobile number associated with the selected account.  The claimant

16

must also sign and date the form, making the attestation set forth above under penalty of perjury.

17

If the claimant seeking to submit a paper Claim Form does not have a Notice ID, the claimant

18

must provide their contact information, mailing address, email address, and selection of one of the

19

three payment options.  The claimant must also complete the "Other Information" section

20

described above.  The paper Claim Forms state the postmark deadline in the upper left corner of

21

the first page.

22

### F.    Release

23

Plaintiffs and the Class Members agree to release all "Released Claims" against the

24

"Released Parties" as of the Effective Date.  Settlement Agreement ¶ 88.  The Settlement

25

Agreement defines "Released Claims" as follows:

26

27

28

> [A]ny and all actions, causes of action, claims, demands, liabilities, obligations, damages (including, without limitation, punitive, exemplary and multiple damages), penalties, sanctions, losses, debts, contracts, agreements, attorneys' fees, costs, expenses, and rights of

United States District Court
Northern District of California

any nature and description whatsoever, whether based on federal, state, or local statutes, common law, regulations, rules or any other law of the United States or foreign jurisdiction, known or unknown, fixed or contingent, suspected or unsuspected, in law or in equity, arising from or related to allegations in the Action that were asserted or could have been asserted in the Action by the Releasing Parties against the Released Parties.

*Id.* at ¶ 45.  "Released Parties" means "Plaid and any and all of its present or former predecessors, successors, assigns, parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, and attorneys, and any and all of the parents', subsidiaries', and affiliates' present and former predecessors, successors, assigns, directors, officers, employees, agents, representatives, and attorneys." *Id.* at ¶ 46.

### G.    Appointment of Class Counsel, Attorneys' Fees, and Incentive Awards

Pursuant to the settlement agreement, "Class Counsel" means Christopher Cormier, Burns Charest LLP; Shawn Kennedy, Herrera Kennedy LLP; and Rachel Geman, Lieff, Cabraser, Heimann & Bernstein, LLP.  Settlement Agreement ¶ 20.  Class Counsel will submit a motion for approval of an award of attorneys' fees and costs in an amount not to exceed 25% of the Settlement Fund, plus reimbursement of actual out-of-pocket expenses incurred by class counsel and Plaintiffs' counsel in the action.  *Id.* at ¶ 108.  The motion will be filed at least 35 days in advance of the objection deadline.  *Id.*

Additionally, the Named Plaintiffs may apply for a service award, each of which shall not exceed $5,000, for their services as class representatives.  *Id.* at ¶ 112.

## III.    DISCUSSION

In the Ninth Circuit, there is a "strong judicial policy that favors settlements" of class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  Nonetheless, "Rule 23(e) imposes on district courts an independent obligation to ensure that any class settlement is 'fair, reasonable, and adequate,' accounting for the interests of absent class members."  *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)).

Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of

12

the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). First, the court "must assess whether a class exists," *id.*, and must pay "heightened" attention to Rule 23's requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Supreme Court has explained that "[s]uch attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* (citation omitted). Second, the court must consider whether the proposed settlement "is fundamentally fair, adequate, and reasonable," *Staton*, 327 F.3d at 952, and must ensure that the settlement did not result from collusion among the parties. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (quotation marks and citation omitted).

### A. Conditional Certification of the Settlement Class

"The criteria for class certification are applied differently in litigation classes and settlement classes. In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial. However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019). As noted above, "in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses. *Id.* (citing *Amchem*, 521 U.S. at 620). "[T]he aspects of Rule 23(a) and (b) that are important to certifying a settlement class are those designed to protect absentees by blocking unwarranted or overbroad class definitions. The focus is on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 558 (quotation marks omitted) (quoting *Amchem*, 521 U.S. at 621).

#### 1. Rule 23(a)

Rule 23(a) provides that a class action is proper only if four requirements are met: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)-(4).

##### a. Numerosity

Rule 23(a)(1) requires the class to be 'so numerous that joinder of all parties is impracticable.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No.

1   2672 CRB (JSC), 2017 WL 672820, at *6 (N.D. Cal. Feb. 16, 2017) (quoting Rule 23(a)(1)).  "As

2   a general matter, courts have found that numerosity is satisfied when class size exceeds 40

3   members, but not satisfied when membership dips below 21."  *Slaven v. BP Am., Inc*., 190 F.R.D.

4   649, 654 (C.D. Cal 2000).

5        Here, the proposed class includes approximately 98 million individuals.  Kennedy Decl. ¶

6   24.  Class Counsel derived this figure from current data provided by Plaid and "assumptions from

7   an internal analysis performed by Plaid of its data in 2020."  *Id*.  Numerosity is satisfied.

8                          **b.        Commonality**

9        Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.

10  R. Civ. P. 23(a)(2).  The common question "must be of such a nature that it is capable of classwide

11  resolution-which means that determination of its truth or falsity will resolve an issue that is central

12  to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

13  338, 350 (2011).

14       Here, there are a number of key common questions of law and fact arising out of Plaid's

15  practices.  These include whether Plaid invaded Plaintiffs' and the Class Members' reasonable

16  expectations of privacy, whether Plaid omitted or concealed material facts from Plaintiffs and the

17  Class Members, whether Plaid's privacy policy disclosed Plaid's conduct and whether Plaid gave

18  effective notice of its policy, and whether Plaid obtained Plaintiffs' and the Class Members'

19  consent to obtain, store, and use their banking credentials and private financial information.  The

20  commonality requirement is satisfied.

21                          **c.        Typicality**

22       Under Rule 23(a)(3), the claims of the representative parties must be "typical of the claims

23  . . . of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality 'assure[s] that the interest of the named

24  representative aligns with the interests of the class.'"  *Volkswagen*, 2017 WL 672820, at *7.

25       Typicality is satisfied here.  Plaintiffs' claims stem from the same course of conduct and

26  pattern of alleged wrongdoing as the claims of the Class Members; that is, that Plaid obtained their

27  confidential login information by means of an interface that Plaintiffs allege improperly mimicked

28  the look and feel of bank login screens, and that Plaid collected certain financial data without

United States District Court
Northern District of California

14

1    permission.  Plaintiffs' claims are typical because they were subjected to the same conduct as the

2    other Class Members and suffered the same injury as a result.

3                              **d.      Adequacy**

4           Finally, Rule 23(a)(4) requires that the named plaintiffs, who seek to be class

5    representatives, "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

6    23(a)(4).  Courts engage in a dual inquiry to determine adequate representation and ask: "(1) do

7    the named plaintiffs and their counsel have any conflicts of interest with other class members and

8    (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

9    class?"  *Volkswagen*, 2017 WL 672820, at *7.

10          Plaintiffs and Class Counsel are adequate representatives of the class.  Plaintiffs were

11   allegedly injured by the same course of conduct common to all class members.  Accordingly, their

12   interest in this litigation is aligned with that of the class.  *See Amchem*, 521 U.S. at 594-95

13   ("Representatives must be part of the class and possess the same interest and suffer the same

14   injury as the class members.").  As to Class Counsel, the attorneys with Burns Charest, LLP;

15   Herrera Purdy LLP; and Lieff, Cabraser, Heimann & Bernstein, LLP have significant experience

16   litigating, trying, and settling class actions, including consumer class actions, and the court

17   previously approved those three firms as Interim Co-Lead Counsel due to their qualifications,

18   experience, and commitment to the prosecution of this case.  [*See* Docket No. 57.]

19                              **2.      Rule 23(b)(3)**

20          In addition to meeting the prerequisites of Rule 23(a), Plaintiffs must also meet one of the

21   three requirements of Rule 23(b) to certify the proposed class.  Plaintiffs seek certification of the

22   class under Rule 23(b)(3), which states that a class action may be maintained if "the court finds

23   that the questions of law or fact common to the members of the class predominate over any

24   questions affecting only individual members, and that a class action is superior to other available

25   methods for fairly and efficiently adjudicating the controversy."  *See* Fed. R. Civ. P. 23(b)(3).

26   Certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be

27   served best by settling their differences in a single action."  *Hanlon v. Chrysler Corp.*, 150 F.3d

28   1011, 1022 (9th Cir. 1998) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  Kane, *Federal Practice & Procedure* § 1777 (2d ed. 1986)).

2  **a.  Predominance**

3  Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a predominance finding:

4  
5  (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

6  (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

7  (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

8  
9  (D) the likely difficulties in managing a class action.

10  This "inquiry focuses on the relationship between the common and individual issues." *Vinole v.*

11  *Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (internal quotation marks and

12  citation omitted).  Specifically, the predominance requirement "tests whether proposed classes are

13  sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594.

14  The Ninth Circuit has noted that predominance is "readily met" in cases alleging consumer fraud.

15  *In re Hyundai*, 926 F.3d at 559.

16  The common questions in this case, as set forth above, predominate over any individual

17  issues that might exist.  Plaintiffs allege that Plaid engaged in the same alleged illegal conduct

18  with respect to all of the Class Members; that is, that Plaid misled Plaintiffs and the Class

19  Members by obtaining the bank login information and data from their financial accounts without

20  their permission, and then collected their private financial data and sold it to third parties.  The

21  claims asserted are brought under legal theories that apply to the class as a whole.  The Class

22  Members do not have a strong interest in bringing individual cases, as the maximum amount of

23  recovery for an individual class member would likely be a fraction of the cost of bringing a

24  lawsuit.

25  **b.    Superiority**

26  The superiority requirement focuses on "whether maintenance of [the] litigation as a class

27  action is efficient and whether it is fair." *Volkswagen*, 2017 WL 672820, at *8.  "[M]anageability

28  of a class action for purposes of Rule 23(b)(3) is not an issue in the settlement context because the

1    case will not be tried."  2019 WL 536661, at *7.

2         Here, the proposed class consists of tens of millions of individuals.  Where each class

3    member bringing an individual suit "would be required to prove the same wrongful conduct to

4    establish liability and thus would offer the same evidence, . . . classwide resolution of their claims

5    is clearly favored over other means of adjudication." *Volkswagen*, 2017 WL 672820, at *8.  As

6    discussed above, the range of issues is limited and individual cases addressing these issues would

7    likely address the same wrongful conduct and use the same supporting evidence.  The proposed

8    class meets the superiority requirement.

9                                              * * *

10        In sum, Plaintiffs satisfy the Rule 23(a) and Rule 23(b)(3) requirements.  Accordingly,

11   provisional certification of the class for settlement purposes is warranted in this case.[5]

12        **B.      Preliminary Approval**

13        The court examines two authorities in deciding whether to grant preliminary approval: (1)

14   the fairness factors set forth in *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575

15   (9th Cir. 2004); and (2) the factors in Rule 23(e)(2).  "The relative degree of importance to be

16   attached to any particular factor will depend upon . . . the unique facts and circumstances

17   presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of*

18   *San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  The court will also consider the Northern

19   District of California's Procedural Guidance for Class Action Settlements.[6]

20              **1.  *Churchill* Factors**

21        A class action "may be settled, voluntarily dismissed, or compromised only with the

22   court's approval."  Fed. R. Civ. P. 23(e).  The "decision to approve or reject a settlement is

23   committed to the sound discretion of the trial judge because he is exposed to the litigants, and their

24   strategies, positions, and proof." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir.

25   2000) (citation omitted).  The district court's role in reviewing proposed class action settlements is

26   _____

27   [5] The court's discussion of the differences between the settlement class and the class proposed in
     the operative complaint is below in section III.B.3.

28   [6] Available at https://www.cand.uscourts.gov/ClassActionSettlementGuidance.

United States District Court
Northern District of California

to determine whether a settlement is "fundamentally fair, adequate, and reasonable." *Id.*  The

court is tasked with balancing a number of factors, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575.

### a. Strength of Plaintiffs' Case and Risks of Litigation

The first three factors are addressed together and require the court to assess the plaintiff's

"likelihood of success on the merits and the range of possible recovery" versus the risks of

continued litigation and maintaining class action status through the duration of the trial.  *See*

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365-CW, 2010 WL 1687832, at *9 (N.D.

Cal. Apr. 22, 2010).  However, the court need not "reach any ultimate conclusions on the

contested issues of fact and law which underlie the merits of the dispute, for it is the very

uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce

consensual settlements."  *Officers for Justice*, 688 F.2d at 625.  These factors weigh in favor of

approving settlement when the defendant has "plausible defenses that could have ultimately left

class members with a reduced or non-existent recovery."  *In re TracFone Unlimited Serv. Plan*

*Litig.*, 112 F. Supp. 3d 993, 999 (N.D. Cal. 2015).

Following the court's order dismissing certain claims in the CFAC with prejudice, the

remaining claims are invasion of privacy—intrusion into private affairs; unjust enrichment;

violation of Article I, Section I of the California Constitution; violation of CAPA; and violation of

California Civil Code sections 1709 and 1710.  Plaintiffs state that they are "confident in the

strength of their claims and their ability to ultimately prevail at trial," but concede that this

litigation is inherently risky.  Mot. 16.  Plaintiffs allege a large class challenging conduct since

2013, implicating at least four different fintech apps and financial institutions.  Plaintiffs maintain

that there is a "core continuity of practices involving relatively simple issues," *id.*, but Plaid would

almost certainly strenuously oppose class certification based on purported differences between

18

1    apps and financial institutions, and differences in their practices and disclosures over time.

2    Further, even if the class were certified, Plaid could still move to decertify the class at any time.

3    *See In re Netflix Privacy Litig.*, No. 5:11-CV-00379-EJD, 2013 WL 1120801, at *6 (N.D. Cal.

4    Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that

5    weighs in favor of settlement.").

6          There is also a risk to individual and class recovery based on the possibility of Plaid

7    prevailing on the merits of Plaintiffs' claims at any stage of the litigation, including on appeal.

8    Plaid would likely raise multiple defenses to Plaintiffs' claims in order to avoid liability.  For

9    example, Plaintiffs note that the CAPA is relatively untested.  In its motion to dismiss, Plaid

10   argued that the CAPA does not apply to Plaid as a matter of law, and that the intent of the statute

11   was to criminalize phishing, which it claimed was not at issue in this case.  [Docket No. 78 (Mot.

12   to Dismiss) 33-34.]  The court rejected this argument but noted that its own research yielded no

13   cases analyzing the CAPA.  *Cottle*, 2021 WL 1721177, at *20.  Any failure by Plaintiffs to prevail

14   on the CAPA claim, which is the only remaining claim authorizing statutory damages, would

15   significantly impact the value of the class claims.

16         The court concludes that there is significant risk to individual and class recovery if the case

17   were to proceed further in litigation.  Weighing the potential benefits to the class against the risks

18   of continued litigation, the court finds that first three *Churchill* factors support approving the

19   settlement.

20                    **b.      Amount Offered in Settlement**

21         The fourth *Churchill* factor looks at the amount of recovery offered in settlement.  When

22   considering whether the amount offered in settlement is fair and adequate, "[i]t is the complete

23   package taken as a whole, rather than the individual component parts, that must be examined for

24   overall fairness."  *Officers for Justice*, 688 F.2d at 628.  In addition, "it is well-settled law that a

25   proposed settlement may be acceptable even though it amounts to only a fraction of the potential

26   recovery that might be available to the class members at trial."  *Nat'l Rural Telecommunications*

27   *Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

28         The Settlement Agreement provides that Plaid will pay $58 million to create a Settlement

United States District Court
Northern District of California

1   Fund.  From that fund will be deducted up to $5.5 million in costs for administration of the

2   settlement, including providing notice and processing claim forms, as well as up to $14.5 million

3   in attorneys' fees, plus additional costs and service awards.  This would leave approximately $38

4   million to be distributed to the Class Members.

5           Angeion estimates the claims rate to be between 1% and 4% of the proposed class of 98

6   million individuals.  2d Weisbrot Decl. ¶¶ 4 n.3, 23.  In order to determine this estimate, Angeion

7   compared the proposed settlement with ten recent settlements it administered in cases involving

8   "privacy concerns."  The average claims rate in these cases was 3.87%; the median claims rate

9   was 3.51%.  *Id*. at ¶¶ 16-17.  It also compared the proposed settlement to five settlements it

10  administered in cases involving tens of millions of class members; the average claims rate for

11  these cases was 1.41% and the median claims rate was 2.31%.  *Id*. at ¶¶ 18-19.  Finally, Angeion

12  compared the proposed settlement to six settlements it administered that utilized "comparable

13  noticing efforts."  The average claims rate for this set of cases was 3.73% and the median claims

14  rate was 3.92%.  *Id*. at ¶¶ 21-22.  Based on Angeion's estimate that the claims rate will be between

15  1% and 4% of the total class, Class Members will receive individual payments ranging from

16  approximately $10 to $39 per person.  The court finds that the proposed settlement falls well

17  within the range of reasonableness, particularly given the robust injunctive relief that will benefit

18  the class, including Plaid's deletion of Class Members' data where the connected application did

19  not request the data and for users for whom Plaid no longer has valid means to authenticate with

20  the financial institution.  Notably, Class Members did not incur any out-of-pocket expenses in

21  connection with Plaid's alleged wrongdoing.  Moreover, following the court's order on Plaid's

22  motion to dismiss the CFAC, the sole remaining claim that authorizes statutory damages is the

23  CAPA claim.  CAPA authorizes injunctive relief and recovery of "the greater of three times the

24  amount of actual damages or five thousand dollars ($5,000) per violation."  Cal. Bus. & Prof.

25  Code § 22948.3(a)(2).  Given the class size, the potential recovery of damages under the CAPA is

26  nearly half of a trillion dollars, a sum that is outside the realm of possibility of being awarded or

27  collected in this action.  As discussed above, the CAPA is untested and the likelihood of Plaintiffs

28  prevailing on this claim is uncertain.  The court finds that the $58 million offered in settlement in

United States District Court
Northern District of California

1  this case represents a fair and adequate compromise.

2       Additionally, the size of the Settlement Fund compares favorably with other settlements

3  that have been approved in privacy cases in this district.  *See, e.g., In re Linkedin User Privacy*

4  *Litig.*, 309 F.R.D. 573, 581, 588 (N.D. Cal. 2016) (granting final approval of $1.25 million

5  settlement where the class size was estimated to be 800,000, with each claimant receiving $14.81);

6  *Perkins v. Linkedin Corp.*, No. 13-cv-04303 LHK, 2016 WL 613255, at *2, 9 (N.D. Cal. Feb. 16,

7  2016) (granting final approval of $13 million settlement where the class size was approximately

8  20.8 million; each claimant received approximately $20); *Ebarle v. Lifelock, Inc.*, No. 15-CV-

9  00258-HSG, 2016 WL 5076203, at *2, 5 (N.D. Cal. Sept. 20, 2016) (granting final approval of

10 $68 million settlement where class members who made claims received approximately $20 plus

11 the amount paid for service, and subclass members received either $19.48 or $39.48); *In re Google*

12 *LLC St. View Elec. Commc'ns Litig.*, ---F. Supp. 3d---, No. 10-MD-02184-CRB, 2020 WL

13 1288377, at *11 (N.D. Cal. Mar. 18, 2020) (granting final approval of non-distributable $13

14 million settlement where the class size was 60 million); *Campbell v. Facebook Inc.*, No. 13-CV-

15 05996-PJH, 2017 WL 3581179, at *4 (N.D. Cal. Aug. 18, 2017), *aff'd*, 951 F.3d 1106 (9th Cir.

16 2020) (granting final approval of settlement providing for injunctive relief only and no monetary

17 relief).

18       Finally, there is no possibility of reversion to Plaid.  In sum, the court concludes that this

19 factor weighs in favor of approval.

20                          c.        **Stage of Proceedings**

21       Class settlements are presumed fair when they are reached "following sufficient discovery

22 and genuine arms-length negotiation."  *DIRECTV, Inc.,* 221 F.R.D. at 528; 4 Newberg at § 11.24.

23 "The extent of discovery [also] may be relevant in determining the adequacy of the parties'

24 knowledge of the case."  *DIRECTV*, 221 F.R.D. at 527 (quoting *Manual for Complex Litigation,*

25 *Third* § 30.42 (1995)).  "A court is more likely to approve a settlement if most of the discovery is

26 completed because it suggests that the parties arrived at a compromise based on a full

27 understanding of the legal and factual issues surrounding the case."  *Id.* (quoting 5 *Moore's*

28 *Federal Practice*, §23.85[2][e] (Matthew Bender 3d ed.)).  However, "[i]n the context of class

United States District Court
Northern District of California

1    action settlements, as long as the parties have sufficient information to make an informed decision

2    about settlement, 'formal discovery is not a necessary ticket to the bargaining table.'" *Wilson v.*

3    *Tesla, Inc.*, No. 17-cv-03763-JSC, 2019 WL 2929988, at *8 (N.D. Cal. July 8, 2019) (quoting

4    *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).

5         Plaintiffs state that they sought and received "extensive" discovery from Plaid through

6    formal written discovery requests as well as informal requests for documents, data, and other

7    information during settlement negotiations.  Mot. 20; Kennedy Decl. ¶ 7.  Plaid ultimately

8    produced over 12,000 pages of documents and responded to 57 document requests, 21

9    interrogatories, and 51 requests for admission.  Kennedy Decl. ¶ 7.  The documents produced by

10   Plaid included internal policies and procedures, agreements, correspondence, investigatory

11   materials, client lists, and detailed financial information.  *Id.*  Plaintiffs also commenced third-

12   party discovery, having subpoenaed and started discussions with banks.  *Id.*

13        Plaintiffs also state that they undertook a substantial investigation prior to the filing of the

14   first complaint in the five lawsuits.  The investigation included reviewing materials including

15   videos, message board posts, web pages, submissions to government regulators, podcasts,

16   marketing materials, and articles, as well as engaging a subject matter consultant to analyze

17   various aspects of Plaid's software.  *Id.* at ¶ 4.  Ultimately, Class Counsel states that they "had a

18   wealth of information at their disposal before entering into settlement negotiations," which

19   allowed them to assess the strengths and weaknesses of Plaintiffs' claims and balance the benefits

20   of settlement against the risks of further litigation.  *Id.* at ¶ 19.

21        The court finds that the parties adequately investigated the claims and defenses in this case

22   and that the parties had enough information to make an informed decision about settlement.

23                      **d.    Experience and Views of Counsel**

24        Class Counsel's experience is addressed in Section III.A.1.  Additionally, Shawn Kennedy

25   of Herrera Kennedy LLP submitted a declaration in support of the motion for preliminary

26   approval.  Kennedy states that he "and the other Class Counsel believe Plaid's commitments [in

27   the proposed settlement] are substantial and will provide fair, reasonable, and adequate benefits to

28   the Class, while reducing the expenditure resources and eliminating the risk of uncertain litigation

United States District Court
Northern District of California

22

1   outcomes."  Kennedy Decl. ¶ 22.

2       The court finds that this factor weighs in favor of finding that the proposed settlement is

3   fair, adequate, and reasonable.

### e.      Government Participant

5       This factor is inapplicable because there is no government participant in this case.  *See*

6   *Mendoza v. Hyundai Motor Co., Ltd*, No. 15-cv-01685-BLF, 2017 WL 342059, at *7 (N.D. Cal.

7   Jan. 23, 2017).

### f.      Reaction of Class Members

9       The reaction of the class members is best assessed at the final approval hearing since the

10   court can look at how many class members submitted claim forms and objections.  *See Rodriguez*

11   *v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (affirming approval of a class action

12   settlement where there were 54 objections out of 376,301 notices sent).  Therefore, this factor

13   should not be considered in preliminary approval.

### 2.      Rule 23(e) Factors

15       Rule 23(e) requires the court to consider whether:

16       (A) the class representatives and class counsel have adequately
            represented the class;

17       (B) the proposal was negotiated at arm's length;

18       (C) the relief provided for the class is adequate, taking into account:

19           (i) the costs, risks, and delay of trial and appeal;

20           (ii) the effectiveness of any proposed method of distributing
                relief to the class, including the method of processing class-
                member claims;

22           (iii) the terms of any proposed award of attorney's fees,
                including timing of payment; and

24           (iv) any agreement required to be identified under Rule
                23(e)(3); and

26       (D) the proposal treats class members equitably relative to each other.

    Fed. R. Civ. P. 23(e).

### a.  Adequacy of Representation

*United States District Court*
*Northern District of California*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

In determining whether to approve a class action settlement, a court must consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).

As noted in Section III.A.1., Plaintiffs' interests are aligned with the interests of the Class Members. Class Counsel states that Plaintiffs "willingly, constructively, and effectively contributed to the prosecution of the claims on behalf of the Class." Kennedy Decl. ¶ 25. They participated in a vetting process undertaken by Class Counsel, stayed informed about the case, preserved documents and ESI, responded to discovery requests, and responded to Class Counsel's requests for information. *Id*. Class Counsel's experience is addressed in Section III.A.d. As noted, Class Counsel are experienced and competent, which is another indication that Plaintiffs have adequately represented the class. *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."). The court finds that this factor is satisfied.

### b.   Non-Collusive Negotiations

The Ninth Circuit "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in approving a class action settlement. *Rodriguez*, 563 F.3d at 965. Courts must "scrutinize agreements for 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect negotiations.'" *Briseño*, 998 F.3d at 1023 (quoting *Bluetooth*, 654 F.3d at 947). These "*Bluetooth* factors" are (1) "when counsel receive a disproportionate distribution of the settlement or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) when the payment of attorneys' fees is "separate and apart from class funds"; and (3) when the parties arrange for benefits that are not awarded to revert to the defendants rather than being added to the class fund. *Id.* The Ninth Circuit recently clarified that "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements . . . to determine if collusion may have led to class members being shortchanged" in both pre- and post-class certification proposed settlements. *Briseño*, 998 F.3d at 1025-26.

The first factor is not present here. Class Members may each claim a monetary

24

distribution from the Settlement Fund.  As addressed further in Section III.B.2.c below, the requested attorneys' fees appear to be within the range of a reasonable fee award.  The court will address the exact amount of fees to be awarded in the order for final approval.  At this stage, however, it does not appear that counsel will receive a disproportionate share of the settlement.

The second *Bluetooth* factor refers to a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from the class fund without objection by the defendant.  Such provisions "carr[y] the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Bluetooth*, 654 F.3d at 947 (internal quotation marks omitted); *see Briseño*, 998 F.3d at 1026-27 ("[a] clear sailing provision signals the potential that a defendant agreed to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the class members."). Here, the parties have agreed that any attorneys' fees will be paid from the Settlement Fund and nothing prevents Plaid from objecting to the amount of fees that Class Counsel will request in its motion for attorneys' fees and costs.  Therefore, there is no "clear sailing" agreement.

There is no concern presented by the third factor, because unpaid funds will not revert to Plaid; rather, such funds will go through a second distribution to Authorized Claimants.  In the event such distribution is not economically feasible, the funds will be distributed to *cy pres* recipients.

In sum, none of the *Bluetooth* factors are present.  The Settlement Agreement "appears to be the product of serious, informed, non-collusive negotiations." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).

### c.  Adequate Relief

In considering whether class relief is adequate, a court must consider:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3) . . .

United States District Court
Northern District of California

1    Rule 23(e)(2)(C).

2                              **i.   Costs, Risks, and Delay of Trial and Appeal**

3            The cost and risk of continued litigation is discussed in Section III.B.1, above.

4                              **ii.   Relief Distribution**

5            Rule 23 requires the court to consider "the effectiveness of any proposed method of

6    distributing relief to the class, including the method of processing class-member claims."  Fed. R.

7    Civ. P. 23(e)(2)(C)(ii).  "Adequate notice is critical to court approval of a class settlement under

8    Rule 23(e)."  *Hanlon*, 150 F.3d at 1025.  "[N]otice must be 'reasonably calculated, under all the

9    circumstances, to apprise interested parties of the pendency of the action and afford them an

10   opportunity to present their objections.'"  *Tadepalli v. Uber Techs., Inc.*, No. 15-cv-04348-MEJ,

11   2016 WL 1622881, at *6 (N.D. Cal. Apr. 25, 2016) (quoting *Mullane v. Cent. Hanover Bank &*

12   *Tr. Co.*, 339 U.S. 306, 314 (1950)).

13           Under the Settlement Agreement, notice will be provided to Class Members in numerous

14   ways, including by email to individuals for whom an email address is available and by postcard to

15   a physical mailing address for those for whom no email address is available.  Weisbrot Decl. ¶¶

16   14-26.  The administrator will also conduct a media campaign including internet banner

17   advertising, social media notice, a paid search campaign, sponsored class action website listings,

18   and social media engagement.  *Id.* at ¶¶ 27-42.  The notice program includes methods for trying

19   alternate means of contacting class members if an email or mail is returned as undeliverable.  For

20   example, if mail is returned as undeliverable, then the administrator will use a skip trace search to

21   identify updated addresses.  *Id.* at ¶¶ 19, 23-26.  Additionally, the administrator will implement a

22   case-specific website and a toll-free hotline that is accessible 24 hours a day, seven days a week.

23   *Id.* at ¶¶ 43-44.

24           Weisbrot, the president of Angeion, states that the digital and social media portions of the

25   notice program are expected to reach 80.40% of the target audience with an average frequency of

26   3.62 times each, separate from the direct notice efforts, sponsored listings, engagement on social

27   media, dedicated website, and telephone line, and that it is the best notice practicable.  *Id.* at ¶¶ 11,

28   46, 50.  Weisbrot's declaration lays out his experience in claims administration, including his

United States District Court
Northern District of California

26

involvement in designing and implementing "hundreds of court-approved notice and administration programs, including some of the largest and most complex notice plans in recent history." *Id.* at ¶ 2. He also submitted quotes from other court orders recognizing the thoroughness of his work. *Id.* at ¶ 7, Ex. A.

As discussed above, Weisbrot estimates that the claims rate in this matter is likely to be between 1% and 4%. Accordingly, the claims rate is projected to be between 980,000 claimants and 3,920,000 claimants.

Another consideration is whether the claims process is burdensome to the Class Members. The administrator will create a case-specific website where Class Members can view general information about the settlement, review relevant court documents, and view dates and deadlines pertinent to the settlement. The website will have a "Contact Us" page where Class Members can send an email with questions to a dedicated email address. Class Members will be able to submit a Claim Form directly via the website. Weisbrot Decl. ¶ 43. Class Members may also print a hard copy of the claim form and mail it to the address listed on the claim form. *See* Settlement Agreement ¶ 80. The court finds that the notice program is adequate as well as reasonably calculated to reach class members, and the claims process is reasonable.

### iii. Attorneys' Fees

"District courts must be skeptical of some settlement agreements put before them because they are presented with a bargain proffered for approval without benefit of an adversarial investigation." *Hanlon*, 150 F.3d at 1021 (internal quotations and citations omitted). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded." *Id.* "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942. The benchmark for a reasonable fee award as a percentage of the common fund is 25%. *Id.* Courts may also cross-check the amount by using both methods. *See Mendoza v. Hyundai Motor Co., Ltd*, No. 15-cv-01685-BLF, 2017 WL 342059, at *14 (N.D. Cal. Jan. 23, 2017).

United States District Court
Northern District of California

1    In this case, Class Counsel will request an award of attorneys' fees of up to 25% of the

2    Settlement Fund, which is $14,500,000, as well as reimbursement of actual expenses incurred by

3    counsel. Settlement Agreement ¶ 108. The court does not award fees at the preliminary approval

4    stage but notes that Class Counsel's anticipated request for 25% of the common fund is

5    presumptively reasonable.

6                                   **iv. Equitable Treatment of Class Members**

7    The proposed settlement provides equal access to the Settlement Fund for all Class

8    Members who submit Approved Claims. Class Counsel explained that each Class Member may

9    submit one claim only, regardless of the numbers of apps that connected to their financial accounts

10   via Plaid's software, because the data went to one place only, i.e., Plaid, and not to numerous

11   entities. Therefore, the proposed settlement treats Class Members equitably.

12                          **3.        Northern District Guidelines**

13   The Northern District of California has issued procedural guidance for the settlement of

14   class actions ("Guidelines"). To the extent the guidelines are not encompassed within the

15   *Churchill* and Rule 23(e)(2) factors discussed above, the court will consider them, although they

16   do not carry the weight of law.

17                              **a.  Identity of Settlement Class**

18   The Guidelines require the parties to state "any differences between the settlement class

19   and the class proposed in the operative complaint and an explanation as to why the differences are

20   appropriate in the instant case." Guideline § 1(a).

21   The CFAC defines the classes as follows:

22           **Nationwide Class:** All natural persons in the United States whose
             accounts at a financial institution were accessed by Plaid using login
23           credentials obtained through Plaid's software incorporated in a
             mobile or web-based fintech app that enables payments (including
24           ACH payments) or other money transfers, including without
             limitation users of Venmo, Square's Cash App, Coinbase, and Strike,
25           from January 1, 2013 to the present.

26           **California Class:** All natural persons in California whose accounts
             at a financial institution were accessed by Plaid using login
27           credentials obtained through Plaid's software incorporated in a
             mobile or web-based fintech app that enables payments (including
28           ACH payments) or other money transfers, including without

United States District Court
Northern District of California

1

> limitation users of Venmo, Square's Cash App, Coinbase, and Strike,
> from January 1, 2013 to the present.

2

3    CFAC ¶¶ 247, 248.

4          The Settlement Agreement proposes the following Settlement Class: "all natural persons

5    who reside in the United States and who own or owned one or more Financial Accounts at the

6    time such persons resided in the United States from January 1, 2013 to the date preliminary

7    approval of the settlement is granted." Settlement Agreement ¶ 19.  The Settlement Agreement

8    defines "Financial Account" as "a financial institution account (1) that Plaid accessed using the

9    user's login credentials and connected to a mobile or web-based fintech application that enables

10   payments (including ACH payments) or other money transfers or (2) for which a user provided

11   financial account login credentials to Plaid through Plaid Link." *Id.* at ¶ 32.

12         According to Class Counsel, the differences between the CFAC's proposed classes and the

13   Settlement Class reflect their determination that 1) "the challenged aspects of Plaid's software and

14   conduct apply to the users of a broader set of fintech apps and services than those enabling

15   payments and money transfers" and 2) "the 'OAuth Process' and 'Managed OAuth Process' that

16   Plaid employed with certain financial institutions at certain points in time should be excluded from

17   the Class." Kennedy Decl. ¶ 23.  Therefore, the Settlement Class is both broader and narrower

18   than the CFAC's proposed classes: it includes users of more fintech apps than those listed in the

19   CFAC's proposed classes and excludes users who connected to their accounts or provided their

20   credentials using a different process than what was alleged in the CFAC. *Id.*  The Settlement

21   Class also eliminates the California class, reflecting Class Counsel's "determination . . . that

22   Plaid's business practices justify application of CAPA to a nationwide class of app users." Mot.

23   30.

24         As to the first point, that the Settlement Class is broader than the CFAC's proposed

25   classes, Class Counsel explained at the hearing that the class alleged in the CFAC focused on

26   individuals whose accounts Plaid accessed in connection with fintech apps that enable payments

27   and money transfers.  In the course of discovery, Class Counsel learned that Plaid used the

28   challenged software (Plaid Link) to allegedly improperly obtain login credentials for users of a

United States District Court
Northern District of California

29

1    broader set of fintech apps, including apps that enable users to budget and manage money and

2    track investments.  Additionally, Class Counsel broadened the Settlement Class to include

3    individuals that Plaid allegedly improperly induced to provide login credentials, even if Plaid did

4    not use the credentials to obtain users' data.  Class Counsel further explained that revising the

5    Settlement Class in these ways does not significantly enlarge the size of the class due to duplicate

6    users; that is, many Class Members who use budgeting and investment apps also use payments

7    and money transfer apps.  Class Counsel estimated that there was a greater than 90% overlap

8    between the two categories of users.

9           Ninth Circuit law supports the elimination of the California subclass in favor of a single

10   nationwide class.  "Subject to constitutional limitations and the forum state's choice-of-law rules,

11   a court adjudicating a multistate class action is free to apply the substantive law of a single state to

12   the entire class."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 561 (citations omitted).  In

13   this case, Plaid's principal place of business in San Francisco, California, CFAC ¶ 25, and their

14   misconduct allegedly originated in California.  "With such significant contacts between California

15   and the claims asserted by the class," application of California law to a nationwide class in this

16   case "would not be arbitrary or unfair to" Plaid, which does not object to such application.  *See,*

17   *e.g., Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010); *Mazza v.*

18   *Am. Honda Motor Co.*, 666 F.3d 581, 589-590 (9th Cir. 2012) ("[u]nder California's choice of law

19   rules, the class action proponent bears the initial burden to show that California has 'significant

20   contact or significant aggregation of contacts' to the claims of each class member.  Such a

21   showing is necessary to ensure that application of California law is constitutional." (internal

22   citations omitted)).  In sum, the court finds that the differences in the class definitions are

23   reasonable and warranted.

24                              **b.      Release of Claims**

25          The Guidelines require the court to look at "any differences between the claims to be

26   released and the claims certified for class treatment and an explanation as to why the differences

27   are appropriate in the instant case."  Guideline § 1(d).

28          The Settlement Agreement provides that the Class Members will release the following:

[A]ny and all actions, causes of action, claims, demands, liabilities, obligations, damages (including, without limitation, punitive, exemplary and multiple damages), penalties, sanctions, losses, debts, contracts, agreements, attorneys' fees, costs, expenses, and rights of any nature and description whatsoever, whether based on federal, state, or local statutes, common law, regulations, rules or any other law of the United States or foreign jurisdiction, known or unknown, fixed or contingent, suspected or unsuspected, in law or in equity, *arising from or related to allegations in the Action that were asserted or could have been asserted in the Action* by the Releasing Parties against the Released Parties.

Settlement Agreement ¶ 45 (emphasis added).

The released claims differ from the claims asserted in the CFAC in that the release applies to claims "arising from or related to" the allegations in the CFAC or that "could have been asserted" in the action. "The Ninth Circuit allows federal courts to release not only those claims alleged in the complaint, but also claims 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (quoting *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010)). Courts in this district have approved releases with similar language. *Id.* (collecting cases). The court finds that the release is not improperly broad. *See*, e.g., *Custom LED, LLC v. eBay, Inc*, No. 12-CV-00350-JST, 2013 WL 6114379, at *4, 7 (N.D. Cal. Nov. 20, 2013) (granting preliminary approval of release of claims "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised based on the allegations of the Action.").

### c.  Settlement Administration

"In the motion for preliminary approval, the parties should identify the proposed settlement administrator, the settlement administrator selection process, how many settlement administrators submitted proposals, what methods of notice and claims payment were proposed, and the lead class counsel's firms' history of engagements with the settlement administrator over the last two years. The parties should also address the anticipated administrative costs, the reasonableness of those costs in relation to the value of the settlement, and who will pay the costs." Guideline § 2.

In his declaration, Kennedy explains the process by which Class Counsel selected Angeion as the administrator:

> Class Counsel chose Angeion Group, LLC ("Angeion") as the settlement administrator for this Action after a competitive selection process involving the solicitation of proposals from three well-known and experienced settlement administration firms. The choice of Angeion was driven by the experience of its principals, the sophisticated and tailored nature of its proposal (especially for reaching Class Members through a digital media campaign), and the overall cost-effectiveness of its proposal. . . . Class Counsel believes [Angeion] will adequately and professionally discharge its duties.

Kennedy Decl. ¶¶ 27-28.

These representations adequately describe the process by which Class Counsel selected Angeion.

### d.    Notice

"The parties should ensure that the class notice is easily understandable, taking into account any special concerns about the education level or language needs of the class members." Guideline § 3. The Guidelines list certain information that should appear in the notice, such as (1) contact information for class counsel; (2) website address for the settlement site; and (3) information on how to access the case docket on PACER. In addition, "[t]he notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2)." Guideline § 3. The notice process is outlined in further detail above.

The information required by Guideline § 3 is listed in the proposed long form notice. Settlement Agreement Ex. C. The email and postcard notices do not contain this information, but directs the recipient to the settlement website, which contains the required information. Based on its review of the class notices and the notice distribution plan, examined in more detail in Section III.B.2, above, the court finds that the class notice in this case is accessible and appropriate.

### e.    Opt-Outs

"The notice should instruct class members who wish to opt out of the settlement to send a letter, setting forth their name and information needed to be properly identified and to opt out of the settlement, to the settlement administrator and/or the person or entity designated to receive opt outs. It should require only the information needed to opt out of the settlement and no extraneous information. The notice should clearly advise class members of the deadline, methods to opt out,

1  and the consequences of opting out."  Guideline § 4.

2         The proposed long form notice contains all the instructions required by Guideline § 4, and

3  the other notices (e.g., email and postcard) refer the reader to the website, which contains the

4  required information.  The court finds that the opt-out procedure available here is reasonable.

5                           **f.     Objections**

6         "The notice should instruct class members who wish to object to the settlement to send

7  their written objections only to the court.  All objections will be scanned into the electronic case

8  docket and the parties will receive electronic notices of filings.  The notice should make clear that

9  the court can only approve or deny the settlement and cannot change the terms of the settlement.

10  The notice should clearly advise class members of the deadline for submission of any objections."

11  Guideline § 5.

12        The proposed long form notice has all the information required by Guideline § 5.  Each of

13  the other notice forms has the objection date noted and refers the reader to the website to read the

14  requirements for objecting.

15        The objection process proposed in this case satisfies the requirements of Guideline § 5.

16                          **g.     Incentive Awards**

17        After the class is notified and has had the opportunity to object, Plaintiffs intend to request

18  incentive awards that do not exceed $5,000 for each of the Class Representatives.  Settlement

19  Agreement ¶ 112.  "The request of $5,000 is reasonable as that amount is the presumptive

20  incentive award in [the Northern District of California]."  *In re Chrysler-Dodge-Jeep Ecodiesel*

21  *Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-md-02777-EMC, 2019 WL 536661, at *9

22  (N.D. Cal. Feb. 11, 2019).  Thus, the incentive award requested is presumptively reasonable.  The

23  court will evaluate any request for incentive awards at the time of the request.

24                    **h.     Class Action Fairness Act ("CAFA") Notice**

25        "The parties should address whether CAFA notice is required and, if so, when it will be

26  given."  Guidelines § 10.

27        The Settlement Agreement provides that "Plaid will provide CAFA Notice of the

28  settlement to the appropriate federal and state officials not later than ten (10) calendar days after

United States District Court
Northern District of California

1    the Agreement is filed with the Court."  Settlement Agreement ¶ 98.

2                                          * * *

3          In sum, the court finds that preliminary approval is warranted in this case.

4    **IV.    CONCLUSION**

5          For the reasons stated above, the motion for preliminary approval is granted.  It is ordered

6    that:

7    1.     The proposed Settlement Class is conditionally certified pursuant to Rule 23(a) and (b)(3)

8    for the purposes of settlement.

9    2.     The Settlement Agreement is preliminarily approved as fair, adequate, and reasonable

10   pursuant to Rule 23(e).

11   3.     The court appoints Plaintiffs Caroline Anderson, James Cottle, Rachel Curtis, David

12   Evans, Logan Mitchell, Alexis Mullen, Jordan Sacks, Frederick Schoeneman, Gabriel Sotelo,

13   Jeffrey Umali, and Nicholas Yeomelakis as Class Representatives.

14   4.     The court appoints Christopher Cormier, Burns Charest LLP; Shawn Kennedy, Herrera

15   Kennedy LLP; and Rachel Geman, Lieff, Cabraser, Heimann & Bernstein, LLP as Class Counsel.

16   5.     Angeion Group, LLC is appointed as the Administrator.

17   6.     The proposed claim forms and forms of notice are approved as to form and content.  The

18   parties shall have discretion to jointly make non-material minor revisions to the claim forms or

19   the class notices.  Responsibility regarding settlement administration, including, but not limited

20   to, notice and related procedures, shall be performed by the Administrator, subject to the

21   oversight of the parties and this court as described in the Settlement Agreement.  The costs of

22   providing notice to the Class Members and for administering the settlement shall be paid out of

23   the Settlement Fund, as provided in the Settlement Agreement.  All Class Members who wish to

24   submit a claim must do so in the manner specified in the Settlement Agreement by April 28,

25   2022.

26   7.     The procedures for Class Members to exclude themselves from or object to the settlement

27   are approved.  Any request for exclusion by a Class Member must be postmarked or submitted

28   electronically on the settlement website by March 4, 2022 and in compliance with the terms of the

Settlement Agreement.  Any objection by a Class Member must be filed with the court by March 4, 2022 and in compliance with the terms of the Settlement Agreement.

8.      The parties shall file any memoranda or other materials in support of final approval of the Settlement Agreement by January 28, 2022 and shall file responses to any timely and valid objection to the Settlement Agreement by March 21, 2022.  Such materials shall be served on Class Counsel, defense counsel, and on any member of the Class (or their counsel, if represented by counsel) to whose objection to the Settlement Agreement the memoranda or other materials respond.

9.      Plaintiffs' claims against Plaid are hereby stayed.

10.     Pending final determination of whether the settlement should be approved, Plaintiffs and each Class Member, and any person purportedly acting on behalf of any Class Member(s), are hereby enjoined from commencing, pursuing, maintaining, enforcing, or proceeding, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral, or other forum, against any of the Released Parties, provided that this injunction shall not apply to the claims of Class Members who have timely and validly requested to be excluded from the Class.  This injunction will remain in force until the Effective Date or until such time as the parties notify the court that the Settlement Agreement has been terminated.

11.     In the event that the proposed settlement is not finally approved by the court, or in the event that the settlement becomes null and void or terminates pursuant to the terms of the Settlement Agreement, this order and all orders entered in connection herewith shall become null and void, shall be of no further force and effect, and shall not be used or referred to for any purposes whatsoever in this litigation or in any other case or controversy, in such event the Settlement Agreement and all negotiations and proceedings directly related thereto shall be deemed to be without prejudice to the rights of any and all of the parties, who shall be restored to their respective positions as of the date and time immediately preceding the execution of the Settlement Agreement.

United States District Court
Northern District of California

12.     Counsel for the parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Settlement Agreement which are not materially inconsistent with either this order or the terms of the Settlement Agreement.

The following deadlines shall apply:

| | |
|---|---|
| Deadline to substantially complete notice plan | January 28, 2022 |
| Deadline for Class Members to submit objections/requests for exclusion | March 4, 2022 |
| Deadline for Class Members to submit claim forms | April 28, 2022 |
| Deadline for Class Counsel to file a list of exclusions | March 18, 2022 |
| Deadline for Parties to respond to objections | March 21, 2022 |
| Deadline for Class Counsel to file motion for final approval | January 28, 2022 |
| Final approval hearing | **May 12, 2022 at 1:00 p.m.** |

   **IT IS SO ORDERED.**

Dated: November 19, 2021



Donna M. Ryu
United States Magistrate Judge