<pre>
1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Donna M. Ryu, Magistrate Judge

4

5   IN RE:                      )
                                )
6   PLAID INC. PRIVACY          )   No. C 20-03056-DMR
    LITIGATION                  )
7                               )
                                )
8   _____)

9                                   Oakland, California
                                    Thursday, September 30, 2021
10
      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
11              RECORDING  1:03 - 1:48 = 45 MINUTES

12  APPEARANCES:

13  For Plaintiffs:
                                    Lieff Cabraser Heimann &
14                                    Bernstein LLP
                                    250 Hudson Street, 8th Floor
15                                  New York, New York 10013
                            BY:  RACHEL GEMAN, ESQ.
16
                                    Herrera Kennedy LLP
17                                  4590 MacArthur Boulevard
                                    Suite 500
18                                  Newport Beach, California
                                     92660
19                          BY:  SHAWN M. KENNEDY, ESQ.

20  For Defendant:
                                    Cooley LLP
21                                  3 Embarcadero Center
                                    20th Floor
22                                  San Francisco, California
                                     94111
23                          BY:  WHITTY SOMVICHIAN, ESQ.

24

25
</pre>

2

1   Transcribed by:                  Echo Reporting, Inc.
                                     Contracted Court Reporter/
2                                    Transcriber
                                     echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Thursday, September 30, 2021</u>                                    <u>1:03 p.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Calling civil case C 20-03056-DMR, In

5  re Plaid Incorporated Privacy Litigation.

6      Counsel, please state your appearances, starting with

7  the plaintiff's attorney first.

8          MS. GEMAN (via Zoom):  Good afternoon.  Rachel

9  Geman, Lieff Cabraser, for plaintiffs and the proposed

10 class.

11         THE COURT:  Good afternoon.

12         MR. KENNEDY (via Zoom):  Good morning --

13 afternoon, your Honor.  Shawn Kennedy of Herrera Kennedy on

14 behalf of the plaintiffs as well.

15         THE COURT:  Okay.  Good afternoon.

16         MR. SOMVICHIAN (via Zoom):  Good afternoon, your

17 Honor.  Whitty Somvichian with Cooley representing Plaid

18 today.

19         THE COURT:  Good afternoon.

20     All right.  We're here for the motion for preliminary

21 approval of class settlement.  I have a number of questions

22 I just want to walk you through as I think about what

23 findings I need to make here.

24     I want to start with the change in the class

25 definition.

4

1      My understanding is that we now have one nationwide
2   class instead of a nationwide and a California class, and
3   the definition is a little different.  I understand the way
4   in which it's more narrow, so it doesn't include people who
5   were connected or credentials were provided exclusively
6   through the managed OAuth process.  That's how it's more
7   narrow.
8      But I want to understand how it's broader.  So who
9   wants to take that up?
10          MS. GEMAN:  I can speak to that your Honor.
11      So as your Honor indicated, it is it is broader, and
12   it's really broader in a couple of respects.
13      Originally, there was a nationwide and a California, so
14   the CAPA claim, which originally was brought only on behalf
15   of a proposed California class, is now being proposed to be
16   settled across a nationwide class for the reasons we set
17   forth in our brief, namely the propriety or at minimum,
18   certainly good faith arguable propriety of extraterritorial
19   application of that claim against a California company.  And
20   certainly since even we brought the case, another case
21   brought a nationwide claim under CAPA that Magistrate Judge
22   Sallie Kim upheld.
23      Judge Kim did not expressly address and indeed was not
24   asked to address the scope.  But there is at least one data
25   point.  That's frankly consistent with our view of the law

5

1   under certain of the cases we cited that, that

2   extraterritorial application is appropriate here.

3        The second --

4            THE COURT:  Excuse me, before you go one, is that

5   a class cert opinion by Judge Kim?

6            MS. GEMAN:  No, your Honor.  That's a motion to

7   dismiss, and I can give your Honor the cite.

8            THE COURT:  Yes, that would be helpful.

9            MS. GEMAN:  Sure.  So the case there is Welsh v.

10  Yodlee, Y-O-D-L-E-E, case number 3:20-cv-05991.  Judge

11  Sallie Kim who upheld the CAPA in an order dated February

12  16, 2021.  That was docket 54 in the case.

13       Now, again, the court was not asked to address and did

14  not undergo the analysis of extraterritoriality, if there's

15  sufficient connections with California and so forth.  But

16  there was that holding.

17       And between that and that our examination of the

18  circumstances under which certain California statutory

19  claims have been held to be extraterritorial, including

20  those under the Business and Professions Code, we thought

21  that the simplified class and plan of allocation was in the

22  best interest of the class here.

23           THE COURT:  I think you cited, if I remember

24  correctly, Chavez and Qualcomm on this point.

25           MS. GEMAN:  We cited a few cases, Chavez and

6

1    <u>Norwest Mortgage</u>, which of course just a -- I mean not

2    just -- but it is a state case, not a federal.

3         Your Honor should be aware, and your Honor may well be

4    aware, that <u>Qualcomm</u> -- which was under the Cartwright Act,

5    not CAPA, not even UCL -- was overturned just last night.

6              THE COURT:  Right.  I was wondering about that

7    because I haven't had a chance to read it.  I don't know

8    if -- the Ninth Circuit vacated Judge Koh's order that you

9    cited to, or I guess it's a written -- published opinion

10   that you cited to.  And I don't know if the Ninth Circuit

11   reached the question of extraterritoriality.  Did it?

12             MS. GEMAN:  With respect to the Cartwright Act,

13   the court rejected the notion that the Cartwright Act could

14   apply extraterritorially because different states -- of

15   course, you know this issue has been around this question of

16   whether indirect purchasers in the antitrust context, which

17   of course is not here, but whether indirect purchasers can

18   bring a claim.

19        There is mature, well understood differences in state

20   law as to whether a state is a Illinois Brick repealer state

21   or not.

22        So we think that context is quite different from here

23   where there is no equivalent -- even putting aside

24   differences between settlement and litigation, it's not as

25   though we are seeing other states saying no, we don't -- you

7

1 know, we disagree with California.  We don't think it's in

2 an interest for a company to have to pay a statutory penalty

3 for this kind of conduct.

4      And here, of course, we have a California company.  And

5 certainly <u>Qualcomm</u> did not address or disturb cases such as

6 <u>Chavez</u> and the authority cited therein.  So our view is that

7 the <u>Qualcomm</u> case does not change the propriety of finding

8 that the plan of allocation here is very reasonable and

9 adequate.

10          THE COURT:  Okay.  So one way it expanded was by

11 making it one national class --

12          MS. GEMAN:  Yes, your Honor.

13          THE COURT:  -- kind of extending that out.

14      Are there other ways in which the definition was

15 broadened?

16          MS. GEMAN:  Yes, your Honor.  The complaint class

17 definition was focused on persons whose accounts were

18 accessed by Plaid in connection with apps that enabled

19 payments.

20      In looking at the discovery, we learned that the

21 template software was used across all of Plaid's apps, at

22 least those in the case, such that even if somebody had an

23 app that was for not just transferring payment but perhaps

24 monitoring their investments or what have you, that they

25 were still improperly spoofed into providing or deceived

8

1  into providing their account information.

2      The other difference is more subtle, which is that in

3  the complaint, the idea was Plaid -- there had to have been

4  a successful connection.  The consumer had to enter her

5  login information and Plaid had to get it.

6      Because of the nature of the Fishing Act claim, the

7  injury is arguably just giving the information, you know,

8  being induced fraudulently.  So even if there was some

9  technical difficulty where Plaid may not have gotten and

10 pulled data for that person, the fact that they gave the

11 data to Plaid was enough of a basis to add the clarification

12 that if you gave Plaid your information, you're covered even

13 if Plaid was not pulling your data.

14      THE COURT:  Okay.  So I think I understand this.

15 We're including instances where the user -- we're using an

16 app that enables payments or other money transfers.  I think

17 that's the same.

18      MS. GEMAN:  That sub-definition of financial

19 account is the same, yes, your Honor.

20      THE COURT:  Okay.  And it covers a situation where

21 the user gave the credentials but didn't necessarily make

22 any connection.

23      MS. GEMAN:  Right.  And it's really just covering

24 that the kind of two -- if you will, there's sort of two

25 species of wrong here.

1      One is this notion of the dignitary invasion of Plaid's

2  getting more information than was disclosed or appropriate,

3  and then the other related harm was the invasion of

4  believing you were giving information to your bank.

5          THE COURT:  Okay.  And did I miss anything else?

6  I sort of feel like you told me something more about how

7  this broadened, it had to do the enabling payments.  I'm

8  sorry if I didn't capture it.

9          MS. GEMAN:  No, no, no.  I'm sorry if I wasn't --

10  so it's whereas the complaint class definition was focused

11  on Fintek apps that enabled payments or money transfers, the

12  class definition in the settlement includes users of apps

13  that were not merely for the purpose of transferring

14  payments.

15          THE COURT:  Okay.  So what kinds of apps are we

16  talking about here?

17          MS. GEMAN:  I don't know -- I mean I'm happy to

18  answer.  I don't know if Mr. Somvichian would prefer to --

19          MR. SOMVICHIAN:  So, your Honor, that could

20  include any number of different types of apps that don't

21  have a payment or money transfer function.  As Ms. Geman

22  referred to, that could be tracking your investments, money

23  management, setting budgets.  There could be a host of

24  different kinds of apps.

25      And the one thing I want to reinforce about the class

10

1  definitions, they are different than what was initially

2  alleged early on in the consolidated amended complaint, but

3  they don't introduce any new issues, and that's really the

4  key.

5      We were trying to make the settlement class definitions

6  precise and to cover the issues raised in the complaint.

7      So, as you noted, the first portion of that settlement

8  class definition -- this is in paragraph 32, the definition

9  of "financial accounts."  There's a sub one and a sub two.

10  The sub one that you pointed to is -- if it's not verbatim,

11  it's very close to the settlement class definition.

12      Sub two refers to the Plaid link issue and we wanted to

13  define that independently of the settlement class because it

14  was raised front and center in the complaint.  It wasn't

15  included in the complaint's proposed class definition, but

16  for purposes of the settlement, we wanted to make sure that

17  that issue raised in the complaint was adequately addressed.

18          THE COURT:  Okay.  And that makes total sense to

19  me.  But I guess the concern is in making a different

20  definition, are we now broadening the class or including a

21  lot of different things that really weren't part of the case

22  or people who weren't necessarily captured by the first

23  definition in the operative pleading and binding them to a

24  class settlement?

25      So what I'd like to know is how did the numbers of

11

1  class members change along with the change of class

2  definition?  Are we now sweeping in millions and millions

3  and millions of people who wouldn't have fallen under the

4  first?

5      Ms. Geman?

6          MS. GEMAN:  Sure, your Honor.  And we do want to

7  emphasize that the spoofing was very much a part of the case

8  as brought.

9      But answering your Honor's question directly, the

10  numbers are not hugely different because of the fact that

11  you had, we understand, many duplicate users.  People would

12  use many different apps.  And so the people who were using

13  some of the more -- you could call them more sophisticated

14  apps, were also often using, for example, a Venmo.

15      I think in terms of the -- because -- and keeping in

16  mind, this is a very large class.  I believe that while

17  there isn't complete overlap, the non-overlap was something

18  like less than -- you know, well under 10 percent.

19          THE COURT:  Okay.  And when we say 98 million

20  estimated class members, are those individuals or are those

21  accounts?

22          MS. GEMAN:  Those are individuals.  And in terms

23  of translating the sort of user IDs to the individuals, if

24  your Honor would like to hear about that, I might

25  respectfully turn to Mr. Kennedy or Mr. Somvichian.

12

1    But your Honor is correct.  There is a difference

2  between a person and a user because -- for various reasons,

3  including using multiple apps.

4          THE COURT:  Okay.  So we're talking -- if we went

5  by the number of apps, this number would be way bigger,

6  right?  We're talking about, generally speaking, a user --

7  I'm going to use synonymously with an individual.  Although

8  I get that that's not correct, but just to have that

9  concept.

10    This is 98 million different people.  And if we were

11  counting by the number of apps they were using instead, it

12  would be -- we're counting class members, right?

13          MR. KENNEDY:  Yes, your Honor.  That's -- the best

14  numbers we have are 98 million individuals, which translates

15  roughly to 150-, 148 million user IDs associated with

16  different bank accounts used in different apps.

17          THE COURT:  Okay.  And what you were explaining on

18  expanding this to cover other kinds of nonpayment-related

19  apps is that it doesn't really add many people, it's the

20  same idea of spoofing, it's just in different categories of

21  apps.  But the people using those apps typically would have

22  had one of the ones that was covered in the original

23  definition, so we're not really bringing in a lot of people.

24    The definition might be bringing in more people than

25  originally pleaded, but it would be something in the range

13

1  of 10 percent.  Have I got that correct?

2          MS. GEMAN:  Ten percent or less, yes.  And we

3  believe it is quite likely bringing in more people as

4  opposed to maybe.  But the numbers are not -- and relative

5  to this size is not driving this.

6          THE COURT:  Okay.  Thank you.

7      Let's turn to the strength of the claims.  And I

8  just -- I need to make some findings on this.  I will say

9  that it's a -- just hearing the number 58 million and

10  looking at the other cases in the privacy area and

11  settlement, it certainly compares favorably.

12      But usually we have some discussion of well, how do

13  we -- is this good value for the class, what is the total

14  exposure or what could be expected and is this a good deal,

15  even though it looks -- it compares favorably.  If this was

16  a fantastic case that had way more exposure, I should be

17  looking at that too.

18      So I looked at the comps.  I also know from having

19  ruled on the motion to dismiss that the CAPA issue is fairly

20  new law.  And it's the only one that has a statutory damage

21  provision.  And that valuing damages in the privacy area is

22  tricky where there isn't something -- I think one of the

23  comps was about an actual data breach, right?  I forget

24  which case that was.  And that had higher numbers,

25  relatively higher numbers, but that's a different situation.

1      You've got actual breach and exposure to potential ID

2 hacks.  And this is a little bit short of that.

3      So tell me why 58 million is a good number, given the

4 claims themselves and the exposure and the risks.

5           MS. GEMAN:  So, your Honor, we think it is a great

6 number.  It's a lot in absolute terms.  It comes with robust

7 and important injunctive relief.

8      I think the point you made on other cases is a good

9 one.  And I think another distinguishing factor with some of

10 the data breach cases is here, candidly, the class was not

11 out-of-pocket.  With some of those other kinds of cases,

12 whether they're data breach or information acquisition,

13 maybe somebody bought a laptop or a TV and they spent money

14 and they might have spent less money had they -- or not

15 purchased the product or stayed at the hotel at all had they

16 known of the privacy risk.

17      So I do think your Honor is absolutely correct to note

18 that distinguishing feature between not only the fact of the

19 mature breach versus the potential one but also the

20 out-of-pocket expenditure, or not, that a class member has.

21      We also took into account that the CAPA claim is

22 untested.  Obviously, the plaintiffs strenuously think this

23 case fits, you know, it's a fit for that claim.  But we also

24 recognize that, unlike with even the biometric Illinois law,

25 which has been sort of tested by the Illinois Supreme Court,

1  this one is new.

2      I mean the other case I cited to your Honor was

3  literally decided five days after your Honor heard oral

4  arguments from us.  There's been no merits finding beyond

5  the pleadings on issues such as adversely affected and so

6  on, to say nothing of how this would look if it went all the

7  way with issues of proportionality and such.

8      So whereas it's of course tempting to say, "Wow, this

9  is a -- if 100 million people got $5,000, that's, you know,

10  half a trillion dollars," that's just never going to happen.

11  Nobody gets a half a trillion dollars.  No company can pay

12  half a trillion dollars, not even the Facebooks of the

13  world.

14      So we were also -- and that was a consideration for us

15  as well as the fact that, as your Honor noted, we -- your

16  Honor did dismiss the UCL claim which would have provided a

17  direct route to a certain kind of restitutionary recovery

18  but also federal statutory claims that carried lesser

19  penalties.

20      The fact that the settlement was reached after,

21  frankly, contentious settlement negotiations with the

22  mediator's proposal, that doesn't itself tell your Honor

23  that the number is high enough, good enough, but it does

24  suggest a process where we really were trying to optimize

25  the number for the class in tandem with the injunctive

16

1 relief.

2      So we think sort of careful comparisons to other cases,

3 is it -- you know, what are the claims, how mature are the

4 claims, what sort of loss could the class be said to have

5 suffered.  Did people have their information in the dark web

6 or not.  Did people spend money they wouldn't have spent.

7      If you sort of look at all that together, while the

8 conduct here we consider very egregious, we think that the

9 settlement amount, particularly given the injunctive relief

10 that is dramatically changing that conduct, is adequate.

11          THE COURT:  Okay.  Thank you.

12      Let's move on to the value to the class members.  And

13 here I'd like to just go through the math.  This was not

14 terribly clear in the papers.

15      So I'm trying to figure out how much are claimants

16 likely to get with the best estimates that we have.  So

17 going to the math, if we take the 58 million, we're going to

18 subtract the fees and costs, service awards, escrow account,

19 tax liabilities and tax expenses, cost of CAFA notice,

20 administrator costs.

21      Where do we get to if we take all those things out and

22 if you were to get an award on fees that is what you're

23 asking for?

24          MS. GEMAN:  So using that kind of math, we would

25 get down to probably about 40 million, maybe a little bit

17

1  higher, frankly.

2      I mean just just to be very candid, it depends a little

3  bit of course on the claims rate in terms of the cost of

4  notice and administration.  We put before your Honor the

5  estimated claims rate of one to four percent, and we did

6  some math that on the one hand looked at one percent, on the

7  other hand looked at four percent.

8      So on the one hand you have 980,000 claimants, on the

9  other four times that.  And each of those might be attached

10 to estimated notice costs.  And our estimate is class

11 members might expect to receive between about 10 and 40.

12          THE COURT:  Okay.  And if we have a low claims

13 rate, it's going to be something like $40 per person?

14          MS. GEMAN:  Yes.

15          THE COURT:  And on the high end, if we have a good

16 turnout, it will be something like $10?

17          MS. GEMAN:  Yes.

18          THE COURT:  Okay.  And the administrative costs

19 are not spelled out.  I know that they're estimated to be

20 roughly -- well, 5.5 million sort of dedicated toward that

21 that Plaid is going to kick it another half million if it

22 goes above that.  I take it that if it went above that, it

23 would come out of class funds.

24          MS. GEMAN:  Meaning if it went above six?

25          THE COURT:  Yes.

1          MS. GEMAN:  Yes, but at that point -- well, yes.

2          THE COURT:  So can you tell me what's driving --

3    why I don't have a better estimate of the administrative

4    costs at this point?  What are the variables?  I think

5    you're pointing toward how many people.

6          MS. GEMAN:  Right.  You want me to --

7          THE COURT:  So maybe you can spell that out for

8    me.

9          MS. GEMAN:  Sorry.

10      Mr. Kennedy, do you want me to turn it over to you?

11         MR. KENNEDY:  Yeah.  The best estimate that we

12   have from the class administrator is between two and a half

13   million and four and a half million based on the claims rate

14   that's anticipated.

15       So like we said in the motion, we don't anticipate

16   hitting that five and half million number, but that's

17   something we negotiated with Plaid in the event it gets that

18   high, that that's an additional benefit to the class.

19       So those estimates that Ms. Geman put out, those are

20   using those rough estimates of class cost.  And it really

21   depends on how many people are responding.

22         THE COURT:  Okay.  And it sounds if people turn

23   out in the way that you estimate currently, we're not going

24   to hit the 5.5, correct?

25         MR. KENNEDY:  Correct.

19

1          THE COURT:  All right.  But you've built in

2     another half million just in case that will be added to the

3     kitty outside of the 58 million, right?

4          MR. KENNEDY:  That's right.

5          THE COURT:  Okay.  So where do you get the one to

6     four percent claim rate?

7          MS. GEMAN:  So, your Honor, that was provided by

8     the claims administrator.  And he in turn got it -- and

9     indeed we did our own independent examination of recent

10    cases -- from a number of cases that are similar.

11        It sort of implicates the reach of the notice, the type

12    of claim.  Your Honor noted in your ASUS opinion that there

13    tends to be different rates depending on how much -- the

14    types of issues.  I think your Honor noted that when there's

15    large purchases, that might suggest a slightly higher rate

16    than when there's maybe something like a false advertising.

17    And so we agree with your Honor that the type of claim

18    informs our thinking about it.

19        Although we do have a fulsome notice plan, the

20    empirical reality is with classes of this size and with

21    these types of claims, that's what the rates tend to be.

22        We don't really ex ante have any reason to think we

23    will go outside that norm.

24          THE COURT:  One area I would like a

25    supplementation of the record is on the claims made --

*Echo Reporting, Inc.*

1          MS. GEMAN:  Certainly, your Honor.

2          THE COURT:  -- so maybe it's Weisbrot (phonetic),

3   maybe a declaration explaining how he came up with that, and

4   perhaps one by counsel, just so you know I understand that

5   there's a factual basis for those estimates.

6          MS. GEMAN:  Certainly, your Honor.

7          THE COURT:  I understand kind of the underlying

8   theory, but I want to see the data.

9          MS. GEMAN:  Right.  And, your Honor, we do have a

10  number of case -- would your Honor like those case cites in

11  the declaration as opposed to our just reading them into the

12  record now or --

13         THE COURT:  The declaration would be very helpful.

14         MS. GEMAN:  Thank you, your Honor.

15         THE COURT:   When do you think you can get those

16  materials in?

17         MS. GEMAN:  We'll have to speak with the claims

18  administrator, but I have no reason to think it would take

19  more than a couple of business days, unless I'm hearing

20  otherwise because we have gathered this information.

21         THE COURT:  Okay.  Well, why don't I say -- I'll

22  order that you submit those materials within a week.  That

23  sounds like it will give you plenty of time.

24       Okay.  So let's talk about pro rata distribution.  What

25  did the data show?  Because obviously I need to justify why

1 we're going to do one person, one claim.  And if the data

2 shows there's a real disparity in that a lot of people only

3 have one and lots of people have many -- more have many, I

4 don't know.  What's the justification for doing it this way?

5          MS. GEMAN:  Well, your Honor, I think the

6 justification is that -- you mean that specifically somebody

7 who only had Venmo versus someone who had Venmo and

8 something else?

9          THE COURT:  Yes.  What is an objector came up and

10 said, you know, this is not a fair settlement because I have

11 20 different accounts and I get the same amount as this

12 person who just has Venmo.

13     And if that's a one-off, I get it, but hopefully you

14 looked more deeply to see whether it's fair to do this pro

15 rata one claim per person.

16          MS. GEMAN:  Well, it's all going to the same

17 place, your Honor, so it would be one thing if somebody had

18 20 claims in 20 different entities, we're getting it, and

19 there could be some argument that that person was at 20-fold

20 the risk of X, Y, and Z happening.

21     But here it's all funneling to the same place.

22          THE COURT:  But no matter how many accounts you

23 had, Plaid ended up with it, is what the argument would be.

24          MS. GEMAN:  Yes.

25          THE COURT:  It wasn't going to -- okay.  I get it.

22

1        MR. SOMVICHIAN:  And, your Honor, on that point,
2   we have established with plaintiffs -- and we've made this
3   point from day one in the case, that there was never any
4   sale of the data.  Plaid facilitated the connection to the
5   app that the user wanted to enable.  And beyond that, the
6   data was never provided, never sold to any third party.
7        So the point that Ms. Geman made is correct and is
8   something that we verified in the settlement process.
9        THE COURT:  Okay.  Is there something in the
10  record that says that, what you just said, Mr. Somvichian?
11       MR. SOMVICHIAN:  I believe that may have been
12  addressed in some of the discovery responses.  It came up
13  numerous times in the parties' discussions and was certainly
14  a fact that was central in the settlement discussions to get
15  them comfortable that that was the case.
16       I can't point you to a piece of evidence produced in
17  discovery or interrogatory responses at my fingertips, but
18  it was a central point that we established in the course of
19  the negotiations.
20       THE COURT:  Does Plaid have any objection to
21  putting in something on the record so that it's clear?
22       MR. SOMVICHIAN:  No.
23       THE COURT:  Okay.  So in the same time line, if
24  you could get -- whether it's somebody -- a declaration or
25  putting the interrogatory response in the record or whatever

23

1  it is to establish that, I think that helps justify this

2  approach.  Okay?

3          MR. SOMVICHIAN:  Yes.

4          THE COURT:  Okay.  Great.

5      Injunctive relief looked meaningful, and I just had a

6  couple questions.

7      On deleting the data, so I think -- the allegation

8  certainly was that when there's a connection, then Plaid is

9  not just getting access to -- Plaid can go in and it's not

10 just about the transaction that was the subject of getting

11 connected in the first place, like making a payment to

12 somebody.  Actually Plaid could go in and scrape everything

13 from that account and other accounts that were linked to

14 that account.

15     I think that was the allegation.  Am I right, Ms.

16 Geman?

17         MR. KENNEDY:  That's correct, your Honor.

18         THE COURT:  Okay.  So I don't know what happened

19 in discovery, whether that panned out, but what I want to

20 understand now is what will Plaid be getting and what will

21 they be deleting?

22         MR. KENNEDY:  I can address that.

23     So the injunctive relief is really based -- and the

24 contours of it are based on what we learned from Plaid

25 through formal discovery and informal discovery.  And it's

24

1 specifically around its historic business practices in the

2 way that it connected to bank accounts and collected data

3 and then its more recent business practices.

4     And so there was a time where the allegations in the

5 complaint more accurately described what was going on and

6 there was a time where that stopped happening.

7     And so the injunctive relief is really directed toward

8 that former business practice and deleting the data that

9 resulted from that business practice.  And that's what that

10 aspect of it is aimed at.

11    Then you also have the data minimization piece, which

12 really addresses the ongoing business practices in

13 collecting data and specifically limiting it to data that is

14 necessary for the app and actually requested by the app so

15 there's not a disconnect between the data that Plaid is

16 collecting behind the scenes and what is actually delivered

17 up to the app on the consumer's behalf.

18         THE COURT:  Okay.  Great.  Thanks for the

19 explanation.

20    One small point.  On the injunctive relief regarding

21 Plaid Portal, your motion says that Plaid will provide a

22 prominent reference and link to Plaid Portal on its website

23 homepage along with the plain language description of the

24 user controls available on Plaid Portal.

25    It cites to -- the motion cites to paragraphs 58 and 59

25

1  of the settlement agreement, which I don't think says that.

2  And I don't recall seeing it in the settlement agreement.

3      Can you just point me to where Plaid has agreed to make

4  these changes regarding the Plaid Portal?

5          MR. SOMVICHIAN:  Your Honor, it actually is on

6  page 13 of the settlement agreement at paragraph 58, sub A

7  through C, which refers to Plaid Portal and the ways in

8  which Plaid will more prominently publicize those user

9  controls.

10          THE COURT:  Well, the first -- 58 talks about what

11  the class notice is going to say.  And 59 talks about email

12  reminders.  So I don't --

13      MR. SOMVICHIAN:  Yes.  So then up -- your Honor, also

14  look at 54A --

15          THE COURT:  Okay.

16          MR. SOMVICHIAN:  -- which refers to revisions to

17  the website, including a reference to Plaid Portal.

18          THE COURT:  Great.  Thank you.  That's helpful.

19      I think 54A is what I was -- 54 is what I was looking

20  for.  Thank you.  That takes care of that one.

21      Let's go to notice and claim form.  All right.  So on

22  notice, it looks like you're going to be -- I think Plaid is

23  undertaking to give 65 million email addresses to the

24  administrator.  Am I right about that?

25          MR. SOMVICHIAN:  Yes, your Honor.  We're -- I

26

1  don't know where the number will ultimately end up.  There's

2  a decryption process that has to be completed before we can

3  compile the final email notice list.

4              THE COURT:  Okay.

5              MR. SOMVICHIAN:  That was an estimate at the time,

6  but whatever emails Plaid is able to gather, we'll provide

7  those to the claims administrator to facilitate a direct

8  notice to that group of users.

9        And I would add that for that group where Plaid is able

10 to identify a user associated with an email address, the

11 plan is to send them a claims notice that leads to a much

12 simplified and truncated claim form.

13             THE COURT:  Right.

14             MR. SOMVICHIAN:  Those people are essentially

15 pre-verified, and they will have to submit very little

16 information.  And so the claim form that you've seen in the

17 exhibits really relates to the other group for whom Plaid is

18 not able to identify ahead of time and associate with an

19 email address but might submit claims after seeing something

20 in the online advertising notice campaign, for example, or

21 seeing the settlement website.

22             THE COURT:  Okay.  I saw two claim forms, and one

23 I assumed was the one --

24             MR. SOMVICHIAN:  Yes.

25             THE COURT:  It's where you get an ID.

27

1          MR. SOMVICHIAN:  Yes.

2          MR. KENNEDY:  Yes.

3          THE COURT:  And that's generically by -- the

4   pre-verification.

5      Okay.  So for the emails, they're going to be sent over

6   after they're decrypted and collected.  The administrator is

7   going to update them and send them out and then it says

8   "Resend any soft bounces or not delivered," and that's

9   really what's going to happen with emails.  Right?

10      And then the mail is only going to people with mail

11   addresses but no email addresses.  So if somebody has an

12   email address and a mail address, are they only going to get

13   an email?  And if so, why?

14          MR. KENNEDY:  That's correct, your Honor.

15      The number of email addresses -- they had more email

16   addresses than than any other contact information.  The data

17   that Plaid has for all of its records is spotty, so

18   65 million obviously isn't the whole group.

19      There are certain people that they have no contact

20   information for because Plaid is not the app that has the

21   direct relationship with the consumer, by and large.

22      And so sometimes there is an overlap and they have

23   email and mailing address.  And in a few cases, they only

24   have mailing address.  And where they only have the mailing

25   address, we're going to use that for the direct notice, but

28

1  the reliance really, if you look at the entire program,

2  is -- the emphasis is on a combination of media notice

3  through all of the ways that we're going to try to get in

4  front of this this class, whether that's by the social media

5  or banner ads.  All of that is designed to reach 80 percent

6  of the class --

7           THE COURT:  I understand.  I'm trying to -- but,

8  look, the old way of thinking and perhaps the current way of

9  thinking is if you've got a mail address, send mail.  So I'm

10 trying to -- if you're saying we've got 98 million, and

11 Plaid is not the holder of these accounts so it's hard to

12 get -- we're not going to have good email addresses for

13 everybody.  I understand that.  We think maybe's roughly 65

14 million email addresses.

15     How many more do we have hard addresses for; do you

16 know?

17           MR. KENNEDY:  It's a number of -- it's tens of

18 millions.  I don't think we've translated that over into

19 number of users like we have with the other number, because

20 we determined that sending out that many mailers in this

21 situation would be cost prohibitive and would not add that

22 much more value to the overall notice program when you're

23 looking at all the other aspects.

24           THE COURT:  But that part of the analysis was not

25 really in anybody's declaration.  That's what I'm trying to

29

1  understand.  Or maybe if it is, point me to it.

2      But if you're saying this is cost prohibitive, I need

3  to understand why that is, because it seems like if you want

4  to get money in people's pockets, right, then what you're

5  trying to do is reach them.  And you can have a very robust

6  social media campaign.  But as was just pointed out, if

7  people don't get their email notice, then they're going to

8  have to go through a more onerous process to file a claim.

9      We want to get as many people in there as possible that

10  don't have to file the more onerous claim form, so it seems

11  to me we would want to rely on email or direct mailing,

12  unless there's something that is cost prohibitive and not

13  likely to be much of a return.

14      That critical piece is not in your papers, at least

15  that I could find.

16          MR. KENNEDY:  Your Honor, that is not in the

17  papers.  That analysis is not in the papers.  That's

18  something that we'd be happy to supplement with the other

19  portions because it's really based on the considered opinion

20  of our settlement administrator and --

21          THE COURT:  But he needs to give me facts.  I'm

22  sure, you know -- he has to just his thinking on that.

23      It may be completely justifiable that if we look at the

24  numbers on cost and if he says "In my experience" or "Based

25  on the following experiences or data, in this kind of class,

1  it's just not going to get to that many more people," then

2  at least we'll have a factual basis for making that kind of

3  decision to not mail things out when we have their

4  addresses.  Okay?  But that's -- could you please include

5  that with the other piece that he's supposed to be putting

6  in within a week.  Okay?

7           MR. SOMVICHIAN:  Your Honor, would be relevant for

8  this question.  If there is data on the relative claims rate

9  between a mail notice and an email notice -- you know, if

10 for example, the email notices are very unlikely to return a

11 significant portion of claims as opposed to emails (sic),

12 that seems like a relevant data point for this exercise.

13          THE COURT:  Yes, it could be helpful, depending on

14 what how generalized it is or how specific it is, but yes,

15 absolutely.  If there's information on that, that would be

16 very helpful.  I think we're always looking for that

17 information because people are trying to study that.

18      So, yeah, feel free to put whatever you have in the

19 record just so we've got that, so I can make a ruling but

20 also if questions come up, that there's a record to

21 establish the point.

22      Okay.  On the checks, can you make them say that they

23 only have 90 days to cash them so it's clear?  Is that hard?

24      Mr. Kennedy?

25          MR. KENNEDY:  Can we direct the class members that

31

1  they only have 90 days to --

2          THE COURT:  Usually on the check if it's --

3          MR. KENNEDY:  -- cash?

4          THE COURT:  This is going to expire within 90

5  days, right?  So sometimes when we have that situation with

6  checks, we just put it right on there, "This check only good

7  for 90 days."  Any problem with doing that?

8          MR. KENNEDY:  I don't imagine there's any problem

9  on our end, but we can --

10         MS. GEMAN:  I can represent, your Honor, there is

11 no problem with doing that.

12         THE COURT:  Okay.  Again, it's just I think a

13 minimal cost to make sure that money gets in class members'

14 pockets, which is the whole goal here.

15         MS. GEMAN:  Absolutely, your Honor.

16         THE COURT:  A technical issue on the claim forms,

17 so when you're -- I think in either claim form, it prompts

18 you to put in your email address and then it asks whether

19 you want to be paid by PayPal, Venmo or check.

20    And the question is, what if someone says PayPal but

21 their PayPal account uses a different email than the email

22 they just gave you, which I think is not uncommon.  Is the

23 money going to get to the right person if they don't have

24 that email to get to the PayPal account?

25         MS. GEMAN:  Your Honor, our understanding is, yes,

32

1  it will get to the right person.

2        THE COURT:  Okay.  So I guess you're saying you

3  vetted that issue.  We're not going to have some weird

4  technical "oops" down the road.

5        MS. GEMAN:  Yes, your Honor.  We definitely want

6  to avoid a weird technical oops.

7        THE COURT:  Okay.  All right.  And you've

8  addressed that very question with your administrator?

9        MS. GEMAN:  Yes, your Honor.  I'm in fact in real

10 time doing so, yes.

11       THE COURT:  Okay.

12       MS. GEMAN:  Reconfirming as it were.

13       THE COURT:  Great.

14    And then on cy pres, how likely is it that there's

15 going to significant unclaimed funds; do we know?

16       MR. KENNEDY:  How likely is it?

17       THE COURT:  I guess it's about people, whether

18 they're going to cash a $10 check or a $20 check.

19       MR. KENNEDY:  Yeah, we --

20       MR. SOMVICHIAN:  I would point out, your Honor,

21 there's also the mechanism that's built in the settlement

22 process that we contemplated where there is an amount --

23 usually it's from uncashed checks, right? -- and if we

24 determine that it's economically rational to send that out,

25 for example, to people who have already received some amount

1 through an electronic means that we have already

2 successfully paid through, that we send out those additional

3 funds. So it's hard to see a significant amount remaining

4 for cy pres.

5         MS. GEMAN: And I would add to that, your Honor,

6 given the nature of this class in particular and the options

7 that we've afforded for the Venmo and the PayPal -- I don't

8 want to say the hope is people don't do check. People can

9 choose what they want, but certainly the fact that there's

10 those different options we think further blunts against the

11 specter of significant unclaimed or uncashed checks.

12         THE COURT: Okay. So we think -- I mean nobody

13 can be totally sure, but we think probably not significant

14 unclaimed funds or at least you've done what you can to

15 minimize that.

16     If there are, then you're going to look at whether it's

17 economically feasible for a second distribution and only

18 then will it go to the two cy pres designees.

19     So are there any connections between class counsel or

20 clients with these two cy pres designees?

21         MS. GEMAN: No, your Honor.

22         THE COURT: Have you done that check to make sure?

23         MR. KENNEDY: Yes.

24         THE COURT: Okay. So you're representing to the

25 Court for all, I guess, 12 main plaintiffs as well as your

34

1 firms, there's nobody who's been on the board or, you know,

2 whatever the connection might be?  Because I think that is

3 sometimes a vulnerability.

4          MR. KENNEDY:  Yes.  We ran that check.

5          THE COURT:  Okay.  Well, those are the questions I

6 had.  I look forward to getting your supplemental materials

7 within a week.  And I will finish checking everything out,

8 but it certainly looks like a significant -- this is

9 significant relief.

10     So thank you.  Is there anything further from counsel?

11          MR. KENNEDY:  No, your Honor.

12          MR. SOMVICHIAN:  No, your Honor.

13          THE COURT:  All right.  Thank you all.

14          MS. GEMAN:  Thank you for your Honor's time.

15          MR. KENNEDY:  Thank you very much.

16          MR. SOMVICHIAN:  Thank you, your Honor.

17     (Proceedings adjourned at 1:48 p.m.)

18

19

20

21

22

23

24

25

35

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14                    

15

16            Echo Reporting, Inc., Transcriber

17              Wednesday, April 13, 2022

18

19

20

21

22

23

24

25