UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES COTTLE, et al.,

              Plaintiffs,

     v.

PLAID INC.,

              Defendant.

Case No. 20-cv-03056-DMR

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Re: Dkt. No. 156

This action consists of five separately-filed putative class actions in which 11 named plaintiffs allege that Defendant Plaid Inc. ("Plaid") uses consumers' banking login credentials to harvest and sell detailed financial data without their consent. The court consolidated the matters in July 2020. Plaintiffs now seek final approval of a class action settlement. They also move for attorneys' fees, reimbursement of expenses, and service awards. [Docket Nos. 156, 157.] The court held a final fairness hearing on May 12, 2022 and ordered Class Counsel to submit supplemental evidence supporting the request for attorneys' fees, which they timely filed. [Docket Nos. 177, 182, 183.] For the following reasons, final approval is granted. The motion for attorneys' fees, reimbursement of expenses, and service awards is granted in part.

I.      **BACKGROUND**

      A.      **Factual Allegations and Procedural History**

Plaid is a tech startup in the financial technology or "fintech" industry. It provides bank "linking" and verification services for fintech apps that consumers use to send and receive money from their financial accounts, such as Venmo, Coinbase, Cash App, and Stripe. [Docket No. 61 (Consolidated Amended Class Action Complaint, "CFAC") ¶¶ 2, 32.] Plaintiffs are Caroline Anderson, James Cottle, Rachel Curtis, David Evans, Logan Mitchell, Alexis Mullen, Jordan Sacks, Frederick Schoeneman, Gabriel Sotelo, Jeffrey Umali, and Nicholas Yeomelakis. They are

consumers in five states and the District of Columbia who linked their bank accounts to fintech apps using Plaid's software. CFAC ¶ 99. Plaintiffs allege that in connection with the linking and verification process, Plaid misled them and violated their privacy and the privacy of the putative class members by obtaining data from their financial accounts without authorization and by obtaining their bank login information through its user interface, known as "Plaid Link." According to Plaintiffs, Plaid designed the login screens in its interface to give them the look and feel of login screens used by individual financial institutions. However, Plaintiffs allege, Plaid fails to disclose to its users that they are not actually interfacing with their bank. *Id.* at ¶¶ 37-40. Plaintiffs further allege that by using the accumulated consumer bank login information, Plaid has collected a significant amount of consumer banking data that it routinely sells to third parties. *Id.* at ¶¶ 48, 59-60.

Plaintiffs filed their original complaints in five separate lawsuits in May, June, and July 2020. The court related the cases and subsequently consolidated them in one action, No. 20-cv-3056, *In re Plaid Inc. Privacy Litigation*, and granted the parties' request to appoint Interim Co-Lead Counsel and a Steering Committee. [Docket No. 57.] Pursuant to court order, Plaintiffs filed the CFAC on August 5, 2020. [Docket No. 61.]

Plaid moved to dismiss the CFAC, and the court granted the motion in part and denied it in part on April 30, 2021. *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021). In relevant part, the court dismissed with prejudice Plaintiffs' claim for declaratory and injunctive relief as well as four statutory claims. *Id.* at 482, 483-91. The remaining claims are: 1) invasion of privacy—intrusion into private affairs; 2) unjust enrichment (quasi-contract claim for restitution and disgorgement); 3) violation of Article I, Section I of the California Constitution; 4) violation of the California Anti-Phishing Act of 2005 ("CAPA"), California Business & Professions Code section 22948 *et seq.*; and 5) violation of California Civil Code sections 1709 and 1710.

Plaintiffs bring the first two claims on behalf of themselves and the following "Nationwide Class":

> All natural persons in the United States whose accounts at a financial institution were accessed by Plaid using login credentials obtained through Plaid's software incorporated in a mobile or web-based

United States District Court
Northern District of California

> fintech app that enables payments (including ACH payments) or other money transfers, including without limitation users of Venmo, Square's Cash App, Coinbase, and Strike, from January 1, 2013 to the present.

CFAC ¶ 247.  In addition, Plaintiffs Cottle, Evans, Mitchell, Schoeneman, Sotelo, and Umali bring the third through fifth claims on behalf of themselves and the following "California class":

> All natural persons in California whose accounts at a financial institution were accessed by Plaid using login credentials obtained through Plaid's software incorporated in a mobile or web-based fintech app that enables payments (including ACH payments) or other money transfers, including without limitation users of Venmo, Square's Cash App, Coinbase, and Strike, from January 1, 2013 to the present.

*Id*. at ¶ 248.

## B.    Litigation History

The parties participated in two mediation sessions before the Hon. Jay Gandhi (ret.) in February and April 2021.  Following the second mediation, the parties continued their discussions. On June 7, 2021, Judge Gandhi made a mediator's proposal for a class-wide settlement, which the parties accepted on June 11, 2021.  [Docket No. 138 (Kennedy Decl., Aug. 5, 2021) ¶ 10-14.] They executed a long-form settlement agreement on July 30, 2021.  *Id*. at ¶ 14, Ex. A (the "Settlement Agreement").

The court held a hearing on September 30, 2021 on Plaintiffs' motion for preliminary approval of the settlement and ordered the parties to submit supplemental evidence in support of the motion, which they timely filed.  [Docket Nos. 137, 146-149.]  The court granted the motion for preliminary approval on November 19, 2021.  *Cottle v. Plaid Inc.* ("*Cottle II*"), 340 F.R.D. 356 (N.D. Cal. 2021).  It conditionally certified the following Settlement Class: "all natural persons who reside in the United States and who own or owned one or more Financial Accounts at the time such persons resided in the United States from January 1, 2013 to the date preliminary approval of the settlement is granted [November 19, 2021]."  *Id*. at 364, 372; *see* Settlement Agreement ¶ 19.  The Settlement Agreement defines "Financial Account" as "a financial institution account (1) that Plaid accessed using the user's login credentials and connected to a mobile or web-based fintech application that enables payments (including ACH payments) or

other money transfers or (2) for which a user provided financial account login credentials to Plaid through Plaid Link."  Settlement Agreement ¶ 32.

Plaintiffs filed a motion for final approval on January 28, 2022, along with supporting evidence, as well as a motion for attorneys' fees, reimbursement of expenses, and service awards. [Docket Nos. 156-157.]

### C.      Overview of the Proposed Settlement

The terms of the Settlement Agreement and the court's preliminary evaluation of those terms are set forth in detail in the order granting the motion for preliminary approval of the settlement.  *Cottle II*, 340 F.R.D. at 364-69.  The key provisions of the Settlement Agreement are as follows:

**Settlement Fund:** Plaid will pay $58 million (the "Settlement Amount") to create a non-reversionary cash Settlement Fund for the benefit of Class Members.  The following will be deducted from the Settlement Fund: 1) any award of attorneys' fees and costs and service awards; 2) taxes; 3) costs for providing notice under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715; and 4) settlement administration costs.  Settlement Agreement ¶¶ 50, 71, 78.

**Allocation Method:** Each Class Member will receive a distribution from the Settlement Fund via a claims-made pro rata payment.  Class Members will have the option of electing payment by physical check, Automated Clearing House ("ACH") transfer, or deposit to a designated PayPal or Venmo account.  Funds from checks that are not cashed within 90 days of issuance, funds from checks returned as undeliverable, and funds from failed ACH, PayPal, or Venmo transfers shall revert to the Settlement Fund and will go through a second distribution to Authorized Claimants.  In the event that the distribution "is not economically feasible," unclaimed funds will be distributed to *cy pres* recipients.  *Id*. at ¶¶ 78, 84.

**Injunctive Relief:** Plaid will implement several business practice changes.  These include: deleting data from its systems that was retrieved as part of Plaid's "Transactions" product for users that Plaid can reasonably determine did not connect an account to an application that requested Transactions data; deleting data from its systems for users for whom Plaid is aware that it no longer has valid means that can be used to authenticate with the financial institution; including a

prominent reference to Plaid Portal on its website homepage along with a link to the Plaid Portal and a plain-language description of the user controls available; ensuring that its standard Plaid Link flow includes certain disclosures; minimizing the data Plaid stores from users' financial accounts; and enhancing its End User Privacy Policy to provide more detailed information about Plaid's data collection, storage, use, sharing, and deletion practices.  *Id*. at ¶¶ 53, 54, 56, 58, 59, 60-65.

**Release:** Class Members will release all "Released Claims" against the "Released Parties" as of the Effective Date.  Settlement Agreement ¶ 88.  The Settlement Agreement defines "Released Claims" as follows:

> [A]ny and all actions, causes of action, claims, demands, liabilities, obligations, damages (including, without limitation, punitive, exemplary and multiple damages), penalties, sanctions, losses, debts, contracts, agreements, attorneys' fees, costs, expenses, and rights of any nature and description whatsoever, whether based on federal, state, or local statutes, common law, regulations, rules or any other law of the United States or foreign jurisdiction, known or unknown, fixed or contingent, suspected or unsuspected, in law or in equity, arising from or related to allegations in the Action that were asserted or could have been asserted in the Action by the Releasing Parties against the Released Parties.

*Id*. at ¶ 45.  "Released Parties" means "Plaid and any and all of its present or former predecessors, successors, assigns, parents, subsidiaries, affiliates, directors, officers, employees, agents, representatives, and attorneys, and any and all of the parents', subsidiaries', and affiliates' present and former predecessors, successors, assigns, directors, officers, employees, agents, representatives, and attorneys."  *Id*. at ¶ 46.

**Attorneys' Fees, Costs, Service Awards:** Class Counsel will move for an award of attorneys' fees and costs in an amount not to exceed 25% of the Settlement Fund, plus reimbursement of actual out-of-pocket expenses incurred by Class Counsel and Plaintiffs' counsel in the action.  *Id*. at ¶ 108.  Additionally, the Named Plaintiffs may apply for a service award, each of which shall not exceed $5,000, for their services as class representatives.  *Id*. at ¶ 112.

## II.     FINAL APPROVAL

In the Ninth Circuit, there is a "strong judicial policy that favors settlements" of class

United States District Court
Northern District of California

actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). The settlement of a certified class action must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and agreement." *Tadepalli v. Uber Techs., Inc.*, No. 15-cv-04348-MEJ, 2016 WL 1622881, at *6 (N.D. Cal. Apr. 25, 2016). The court maintains an independent duty to examine the fairness of the settlement under Rule 23(e) and the factors articulated in *Churchill Village, L.L.C. v. General. Electric*, 361 F.3d 566, 575 (9th Cir. 2004). *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

In granting the motion for preliminary approval, the court thoroughly examined the fairness of the settlement under the Rule 23(e)(2) factors, the *Churchill* factors, and the Northern District of California's Procedural Guidance for Class Action Settlements ("Procedural Guidance") and concluded that it was fair, adequate, and reasonable. *Cottle II*, 340 F.R.D. at 372-82. The court also found it proper to conditionally certify the proposed settlement class. *Id.* at 370-72. The sole matters that were not resolved at preliminary approval are: (1) whether notice to the class was effective; (2) whether the class member response was favorable; (3) whether the requested attorneys' fees and costs are reasonable; and (4) whether Plaintiffs are entitled to service payments or incentive awards.

### A. Adequacy of Notice

Rule 23 requires the court to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). "[N]otice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Tadepalli v. Uber Techs., Inc.*, No. 15-cv-04348-MEJ, 2016 WL 1622881, at *6 (N.D. Cal. Apr. 25, 2016) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

The court previously approved the notice and notice plan which provided individual notice to the approximately 98 million Class Members through numerous methods, including via email to

1   individuals for whom an email address is available and postcard notice to Class Members for

2   whom a mailing address is provided instead of an email address.  Steven Weisbrot, the President

3   and CEO of the settlement administrator, Angeion Group LLC ("Angeion"), submitted a

4   declaration describing the implementation of the notice program.  [Docket No. 159 (Weisbrot

5   Decl., Jan. 28, 2022).]  Weisbrot states that Plaid provided Angeion with 62,028,348 records of

6   Class Members' email addresses and 654,304 records of Class Members' mailing addresses.  *Id.* at

7   ¶ 6.  After removing duplicates, Angeion caused email notice to be sent to 60,271,546 Class

8   Members with valid email addresses.  In a supplemental declaration, Weisbrot states that as of

9   February 3, 2022, approximately 1,484,447 notices could not be delivered.  [Docket No. 174-1 (2d

10  Weisbrot Decl. ¶ 5.]  Angeion caused reminder email notice to be sent to 58,942,361 Class

11  Members in April 2022.  *Id.* at ¶ 13.

12         Angeion also caused postcard notice to be mailed to the 650,669 Class Member records for

13  whom it had only mailing address information.  Angeion updated the mailing list prior to mailing

14  using the USPS National Change of Address database.  *Id.* at ¶¶ 9, 10.  As of April 28, 2022,

15  62,232 postcards were returned as undeliverable.  After performing skip traces for those postcards

16  returned without a forwarding address, Angeion re-mailed 44,782 postcards to new addresses.  2d

17  Weisbrot Decl. ¶ 8.

18         According to Weisbrot, Angeion implemented a media notice program starting in January

19  2022.  The program included digital banner ads, a social media campaign, a paid search campaign,

20  sponsored class action website listings, and social media engagement.  Weisbrot Decl. ¶¶ 11-17.

21  Weisbrot states that the overall media notice plan delivered over 369 million impressions.  2d

22  Weisbrot Decl. ¶ 12.

23         Angeion established a website that provided detailed information about the settlement and

24  included an online claim portal.  As of May 4, 2022, the website had 8,122,385 page views and

25  4,248,242 sessions individual sessions initiated by users.  *Id.* at ¶ 18.  It also established a toll-free

26  telephone line dedicated to the case; as of May 4, 2022, the number had received 19,928 calls.  *Id.*

27  at ¶ 19.

28         The record does not reveal anything that raises concerns about the reach and effectiveness

of the notice program.  Accordingly, the court finds that the notice distribution plan was the "best notice that is practicable under the circumstances," consistent with Rule 23(c)(2).

### B.    Class Member Response

#### 1.    Claims Rate and Number of Requests for Exclusion

The deadline for Class Members to submit claim forms was April 28, 2022.  As of May 4, 2022, Angeion received 1,256,738 claim form submissions that are subject to final audits, including approximately 100 late-filed claim forms.  2d Weisbrot Decl. ¶ 22.  Accordingly, the estimated claims rate is 1.28%.  *Id*. at ¶ 23.

Based on the claims rate, Class Counsel estimate that Class Members will receive approximately $31.50 each.  [Docket No. 180 (Hr'g Tr., May 12, 2022) 20.]

The deadline to request exclusion from the settlement or object was March 4, 2022.  As of May 4, 2022, Angeion received 1,768 timely requests for exclusion.  *Id*. at ¶ 24.

#### 2.    Objections

Out of the approximately 98 million Class Members, five individuals submitted timely objections.[1]  [Docket Nos. 154 (Laven), 155 (Soldis), 158 (Rice), 161 (Grosklaus), 162 (Helfand).]  Plaintiffs submitted an omnibus response to the objections.  [Docket No. 166 (Pls.' Resp.).]  Most of the objections raise more than one challenge to the settlement, including objections to the amount of attorneys' fees requested by Class Counsel.  Objections to attorneys' fees are addressed in Section III.A, below.[2]

---

[1] A sixth Class Member, Jamyl D. Harris, submitted a letter thanking the court for its work on the case.  [Docket No. 160.]  Two other Class Members submitted objections well after the March 4, 2022 deadline.  [Docket Nos. 168 (Vandehey Obj.), 171 & 173 (Krueger Objs.).]

[2] Objector Steven Helfand appeared at the fairness hearing and spoke on the record regarding his timely objection.  Randal Krueger, who filed an untimely objection to the settlement, also appeared and was granted leave to speak on the record regarding his objection.  [*See* Docket No. 177 (Minute Order).]  According to Krueger, he did not receive the email Class Notice until April 28, 2022, when he located it in his junk mail folder.  Hr'g Tr. 10.  He generally objects that the hourly rates requested by Class Counsel are too high, that the Class Representatives should be awarded Service Awards higher than $5,000, and that Angeion is not responsive.  *Id*. at 11-13.  On Class Counsel's motion, joined by Plaid, the court granted Kreuger leave to file a claim by no later than May 19, 2022 that will be treated as timely.  The court also ordered that the approximately 100 late-filed claims received by the administrator as of the date of the fairness hearing shall be treated as timely.  Minute Order.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

In addressing the following objections, the court "keep[s] in mind that objectors to a class action settlement bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement." *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 592 (N.D. Cal. 2015) (citing *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990)).

Objector Colin Larimer Rice "urge[s] the court to reject this settlement and force a new one to be made which . . . includes a reasonable amount of money," which he suggests would be an amount greater than $100 per claimant.  Rice Obj. 1.  Objector John William Grosklaus endorses Rice's objection regarding the monetary relief and asks for "a new proposed settlement that offers just and adequate compensation for Plaid's actions."  Grosklaus Obj. 2.  However, neither objector explains why the relief already provided for in the Settlement Agreement is inadequate or unreasonable.  As the court explained in granting preliminary approval of the settlement, this litigation is "inherently risky" given the large class size, challenges to conduct dating back to 2013, and differences between fintech apps and financial institutions and Plaid's practices and disclosures over time. *Cottle II*, 340 F.R.D. at 373.  None of the Class Members incurred any out-of-pocket expenses in connection with Plaid's alleged wrongdoing, and the sole remaining claim that authorizes statutory damages is the CAPA claim, which the court noted is "relatively untested." *Id*.  Moreover, these objections do not take into account the robust injunctive relief provided by the settlement that will benefit the Class Members, including Plaid's deletion of Class Members' data where the connected application did not request the data and for users for whom Plaid no longer has valid means to authenticate with the financial institution. Ultimately, "[s]ettlement is the offspring of compromise; the question [the court] addresses is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) (the fact that a settlement amounts "to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair.").  Rice also complains about the cost of mailing a letter "to accept the settlement" as compared to the amount he could receive, Rice Obj. 1, but this ignores that Class Members may make claims online. *See* Weisbrot Decl. ¶ 19.  Accordingly,

United States District Court
Northern District of California

1  these objections are overruled.

2          Grosklaus also objects that the proposed settlement should be rejected because all Class

3  Members who submit a claim will receive "the same monetary benefit," even though some

4  (including Grosklaus) linked multiple Financial Accounts using Plaid and thus "may have

5  significant differences in the amount of data that was unknowingly and/or unnecessarily provided

6  to Plaid."  Grosklaus Obj. 1-2.  However, linking more Financial Accounts through Plaid does not

7  necessarily result in a greater amount of data collected by Plaid.  The operative complaint alleges

8  that Plaid uses consumers' bank login credentials "to obtain the maximum amount of data

9  accessible to the consumer from the bank," CFAC ¶ 49, so the data Plaid collects varies depending

10  on the nature of the account.  Further, Plaintiffs allege that the value of that data Plaid collects is in

11  the aggregate.  *See id*. at ¶ 58.  Moreover, the fact that Class Members' claims may be more

12  valuable than others does not mean that the overall settlement is not fair or adequate.  "[A] class-

13  action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery

14  of the entire class, with all of its class members' varying claims."  *Lane v. Facebook, Inc.*, 696

15  F.3d 811, 824 (9th Cir. 2012) (emphasis in original).  As the Ninth Circuit has explained, "[i]t is

16  an inherent feature of the class-action device that individual class members will often claim

17  differing amounts of damages—that is why due process requires that individual members of a

18  class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to

19  pursue their claims separately," as were the Class Members here.  *See id*.  This objection is

20  overruled.

21          Rice objects that the settlement website does not disclose key pieces of information,

22  including the requested fee award, the number of potential claimants, or the average share of the

23  Settlement Fund Class Members will receive.  Rice Obj. 1.  However, the Long Form Notice is

24  available at the settlement website.  It states that Class Counsel will seek an award of attorneys'

25  fees of up to $14.5 million and explains how the Settlement Fund will be distributed to Class

26  Members.  Weisbrot Decl. ¶ 18, Ex. J; *see* https://plaidsettlement.com/important-documents.php

27  (last visited May 4, 2022).  Further, the FAQs section on the settlement website explains that it is

28  not "possible to provide an estimate of the payment amount before the deadline to file claims"

1    since the Settlement Fund will be distributed on a pro rata basis.  Question 13,

2    https://plaidsettlement.com/frequently-asked-questions.php (last visited May 4, 2022).

3    Additionally, the court's order granting preliminary approval of the settlement is available on the

4    settlement website; that order provides details about the requested fee award, estimated size of the

5    class, estimated number of claimants, and the amount of individual payments based on the

6    estimated claims rate.  *See Cottle II*, 340 F.R.D. at 374, 378.

7           Rice also objects to the opt-out procedure, which requires Class Members to "fill out a

8    paper letter and mail it in."  He claims that this is "unequal treatment" which "allows lawyers to

9    increase their fees by making it harder for claimants to remove themselves from the settlement"

10   and "shows the clear bias" as to which action the attorneys would prefer claimants take.  Rice Obj.

11   1.  There is no authority that provides that a settlement must employ the same method for

12   submitting claims and opt-outs.  In fact, the Northern District's procedural guidance for the

13   settlement of class actions states that requests for exclusion should be submitted by mail.  *See*

14   *Cottle II*, 340 F.R.D. at 381 ("The notice should instruct class members who wish to opt out of the

15   settlement to send a letter, setting forth their name and information needed to be properly

16   identified and to opt out of the settlement, to the settlement administrator and/or the person or

17   entity designated to receive opt outs." (quoting Guideline § 4)).  As to Rice's objection that fewer

18   opt-outs results in higher fees for Class Counsel, this contention is without merit.  Pursuant to the

19   Settlement Agreement, Class Counsel has moved for fees based on a percentage of the Settlement

20   Fund.  The number of opt-outs does not alter the size of the fund or counsel's potential share

21   thereof.  Rice's objections are overruled.

22          Objector Joseph P. Soldis makes a number of objections to the claims process.  He states

23   that the email notice he received "lacks any specific link that takes the claimant to a claims form"

24   and requires a claimant to cut and paste text from the email and open a new page to reach the

25   claims form; that the claim form "is defective and does not work" and he repeatedly received an

26   error code when he attempted to input his bank details; and that the claims process offers only

27   three methods to be paid: PayPal, Venmo, or direct deposit.  Soldis Obj. 1.  According to Soldis,

28   the limited payment methods mean that Class Members without bank accounts are denied the

1    ability to receive payments.  *Id.*

2         Plaintiffs dispute Soldis's claims.  First, they contend that the email notice contains a

3    hyperlink to the settlement website's homepage, and that the website contains a prominently-

4    displayed tab labeled "SUBMIT A CLAIM," which prompts Class Members who received

5    personalized notice to enter a Notice ID and Confirmation Code from the email they received.

6    Pls.' Resp. 6-7; Weisbrot Decl. ¶ 20, Ex. K.  The court concludes that there is nothing about this

7    process that is unduly demanding.  *See* Fed. R. Civ. P. 23, Advisory Committee's Note to 2018

8    Amendments ("A claims processing method should deter or defeat unjustified claims, but the

9    court should be alert to whether the claims process is unduly demanding.").

10        As to Soldis's contention that he received multiple error messages, nothing in the record

11   indicates that this was a widespread issue.  An Angeion representative states in a declaration that

12   "Angeion has not been made aware that the error Mr. Soldis experienced was a common issue

13   amongst Class Members," and that it communicated with Soldis to try to resolve the issue with his

14   claim submission.  [Docket No. 166-2 (Earle Decl., Mar. 21, 2022) ¶¶ 3-5.]  This included

15   providing Soldis with a PDF of the claim form for him to complete and return.  *Id.* at ¶ 4.

16   Finally, Soldis's contention that payment is available only via PayPal, Venmo, or direct deposit is

17   inaccurate.  The payment selection section of the online claim form notified Class Members that

18   they could elect to receive a paper check.  Earle Decl. ¶ 6.  Accordingly, Soldis's objections are

19   overruled.[3]

20        Objector Richard Laven objects to the settlement on the ground that "Plaid's interface did

21   not mimic or did not have the look and feel of [his] bank's account login screen."  Laven Obj. 1.

22   In other words, he appears to object to the settlement on the basis that Plaintiffs' allegations about

23   Plaid Link are inaccurate.  However, he provides no information about when he saw Plaid's

24   interface—that is, whether it was before or after Plaid implemented changes to its interface.  *See*

25   CFAC ¶¶ 72-73 (describing changes Plaid implemented after the action was filed).  Laven's

26   objection does not provide a basis to conclude that the settlement is not fair or adequate.  It is

27   _____

28   [3] Soldis submitted a second letter to the court on March 22, 2022, in which he reiterates his
     concerns about the claims process.  [Docket No. 167.]

United States District Court
Northern District of California

1    overruled.

2          Objector Steven Helfand objects that the class notice "is misleading and violates due

3    process" because it "implies, erroneously, that the judge overseeing this case is an Article III

4    judge, when she is not." Helfand Obj. 1.  Specifically, he highlights the fact that paragraph 26 of

5    the notice refers to the undersigned as "Judge Donna M. Ryu" instead of "Magistrate Judge Donna

6    M. Ryu." *Id*. at 1-2.  According to Helfand, "class members were not put on sufficient notice of

7    the Court's status within the constitutional system" and the case should be referred to an Article

8    III judge to evaluate the fairness of the settlement. *Id*. at 2-3.

9          28 U.S.C. § 636(c)(1) provides that "[u]pon the consent of the parties," a magistrate judge

10   "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of

11   judgment in the case."  As an initial matter, the fact that the notice referred to the undersigned as

12   "Judge" without the prefix "Magistrate" does not imply appointment under Article III of the

13   United States Constitution, and Helfand himself does not contend that he was confused.

14   Moreover, the fact that the undersigned is a Magistrate Judge is prominently disclosed on filings

15   available on the settlement website, including the order granting preliminary approval of the

16   settlement; the order on Plaid's motion to dismiss the CFAC; the court's website; and the case's

17   public docket on PACER and ECF.

18         In the Ninth Circuit, the consent of absent class members is not required for a magistrate

19   judge to exercise jurisdiction over a class action.  *See Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d

20   1071, 1076 (9th Cir. 2017) ("We conclude that [28 U.S.C. § 636(c)] requires the consent of the

21   named plaintiffs alone . . . .").  The case cited by Helfand, *Williams v. Gen. Elec. Cap. Auto Lease,*

22   *Inc.*, 159 F.3d 266, 269-70 (7th Cir. 1998), is fully in accord.  *See id*. at 269 ("absent class

23   members are not 'parties' before the court in the sense of being able to direct the litigation.

24   Instead, the named representative . . . is the 'party' to the lawsuit who acts on behalf of the entire

25   class, including with regard to the decision to proceed before a magistrate judge." (internal

26   citations omitted)).  Helfand appears to suggest that under *Williams*, due process requires a class

27   notice to identify a magistrate judge as such.  Not so.  In *Williams*, the court discussed the options

28   for "[a]n unnamed class member who prefers an Article III forum," including moving to intervene

United States District Court
Northern District of California

13

1
2
3
4
5
6
7
8
9
10
11
12

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to become a party to the lawsuit and then declining consent to proceed before a magistrate judge, or "rais[ing] a collateral attack based on due process against the named representative's decision to consent under [28 U.S.C.] § 636(c)." *Id*. at 269.  The court stated that a class notice's disclosure that the lawsuit was before a magistrate judge would be sufficient to defeat a hypothetical challenge to entry of final judgment based on the decision to proceed before a magistrate judge: "[d]ue process requires no more." *Id*. at 269-70.  The Seventh Circuit did not hold that such a disclosure was necessary in order to satisfy due process.  As set forth above, the docket in this case is replete with references that identify the undersigned as a magistrate judge.  In any event, Helfand does not challenge the parties' decisions to consent to magistrate judge jurisdiction or otherwise object to the undersigned presiding over this case with the consent of the parties. Notably, Helfand argues that the settlement "provides valuable consideration" and should be approved.  Helfand Obj. 3-4.  Helfand's objection is overruled.

### III.    MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS

Class Counsel seek an award of attorneys' fees, expenses, and service awards for each of the 11 class representatives.  [Docket No. 157.]  Plaid does not oppose these requests.

#### A.    Attorneys' Fees

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  The Ninth Circuit has approved two different methods of calculating a reasonable attorneys' fees award: the lodestar method or percentage-of-recovery method.  *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011).  "Because the benefit to the class is easily quantified in common-fund settlements, [the Ninth Circuit has] allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar."  *Id*. at 942.  The benchmark for a reasonable fee award is 25% of the total class recovery, but courts may award more or less than the benchmark if there are "special circumstances" that justify such a departure.  *Id*.

Here, Class Counsel request $14,500,000 in attorneys' fees, which is 25% of the $58 million Settlement Amount and is the benchmark for attorneys' fees under the percentage-of-

1 recovery method.

2   Whether the court awards the benchmark amount or any other rate, the award "must be

3 supported by findings that take into account all of the circumstances of the case." *Vizcaino v.*

4 *Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).  Relevant factors include "(1) the results

5 achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent

6 nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar

7 cases." *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *14 (N.D. Cal.

8 Feb. 16, 2016) (citing *Vizcaino*, 290 F.3d at 1048-50).  Courts may cross-check a percentage of

9 recovery award against the lodestar to guard against an unreasonable result.  *See Bluetooth*, 654

10 F.3d at 944; *Vizcaino*, 290 F.3d at 1050.

11   Taking into account the *Vizcaino* factors, Class Counsel achieved significant monetary and

12 non-monetary results in this case.  Plaid will pay $58 million to establish the Settlement Fund with

13 no reversion.  Based on the estimated claims rate, Class Members will receive approximately

14 $31.50 each.  As the court found in granting preliminary approval, the Settlement Fund compares

15 favorably with other privacy class actions, particularly since the Class Members had no out-of-

16 pocket damages.  *See, e.g., In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 581, 588 (N.D.

17 Cal. 2015) (granting final approval of $1.25 million settlement where the class size was estimated

18 to be 800,000, with each claimant receiving $14.81); *Perkins v. Linkedin Corp.*, No. 13-cv-04303

19 LHK, 2016 WL 613255, at *2, 9 (N.D. Cal. Feb. 16, 2016) (granting final approval of $13 million

20 settlement where the class size was approximately 20.8 million; each claimant received

21 approximately $20); *Ebarle v. Lifelock, Inc.*, No. 15-CV-00258-HSG, 2016 WL 5076203, at *2, 5

22 (N.D. Cal. Sept. 20, 2016) (granting final approval of $68 million settlement where class members

23 who made claims received approximately $20 plus the amount paid for service, and subclass

24 members received either $19.48 or $39.48).

25   Additionally, Class Counsel obtained significant injunctive relief as a result of the

26 litigation.  One of the primary alleged wrongful acts was Plaid's collection of detailed, sensitive

27 consumer financial data when it connected to consumers' accounts.  The settlement provides

28 remediation by requiring Plaid to delete data it collected when an app did not request that data, and

United States District Court
Northern District of California

15

to delete data for users for whom Plaid is aware that it no longer has valid means that can be used to authenticate with the financial institution. Plaid will also minimize the data it collects and stores going forward; make enhanced disclosures in the account connection process and its privacy policy; and include prominent references to Plaid Portal, through which users can view and manage the connections between apps and their financial accounts using Plaid. This injunctive relief provides a meaningful benefit to Class Members and consumers going forward.

Second, as discussed above, the court found that there were risks to individual and class recovery given the nature of the claims and damages, as well as the fact that Plaintiffs challenged Plaid's practices dating back to 2013. Plaid denied liability and would have vigorously contested class certification.

Third, with respect to the quality of litigation, Class Counsel consisted of a team of three law firms, two of which (Lieff, Cabraser, Heimann & Bernstein and Burns Charest, LLP) are led by attorneys with experience in litigating large consumer class actions, including cases involving privacy claims. Class Counsel state that they conducted an extensive factual investigation prior to filing the actions, including hiring an expert, gathering a detailed factual record of Plaid's current and former business practices, and analyzing voluminous materials. They engaged in motion practice, including opposing a motion to dismiss and a motion to stay discovery, and conducted extensive discovery. They also engaged in lengthy and contentious negotiations to resolve the claims, including participating in multiple mediation sessions. [Docket No. 157-1 (Jt. Decl. of Kennedy, Geman, and Cormier, Jan. 28, 2022) ¶¶ 6-9, 11-30.]

Fourth, Class Counsel undertook this matter on a contingent basis, assuming all of the financial risk of litigation with no guarantee of recovery. Jt. Decl. ¶ 49.

While the first four *Vizcaino* factors provide support for the requested award, the lodestar cross-check and comparison of the requested award with attorneys' fees awards made in similar cases (the fifth *Vizcaino* factor) dictate that a lower amount is reasonable and appropriate in this case. The court appointed law firms Herrera Kennedy LLP ("HK"); Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"); and Burns Charest, LLP ("BC") as Co-Lead Class Counsel. Class Counsel calculate the lodestar at $4,394,236, representing at least 5,626.5 hours of work. Jt. Decl.

¶ 3, Table 1; ¶ 47, Table 2.  They represent that this lodestar does not include every hour reported, as it does not include hours by timekeepers who billed less than 10 hours; hours by other attorneys representing named Plaintiffs; or the additional time Class Counsel will spend in seeking approval of and implementing the settlement, including responding to inquiries from Class Members and overseeing distribution of the Settlement Fund, which may require significant further time.  Jt. Decl. ¶¶ 48, 50.  Class Counsel represent that the lodestar was calculated using each of the law firms' current commercial billing rates, and that the rates have been approved and paid in other cases and are consistent with prevailing rates in this district.  *Id*. at ¶¶ 53, 60, 71, 76, Exs. A-C. Based on Class Counsel's lodestar calculation, the lodestar multiplier is 3.29.  They assert that this falls within the Ninth Circuit's "presumptively acceptable" range of 1.0-4.0 in common fund cases.  Mot. for Fees 16 (quoting *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (citing *Vizcaino*, 290 F.3d at 1051 n.6)).

Class Counsel initially filed very general information in support of their fee motion.  In particular, they did not explain in any detail how the three firms approached their division of labor to minimize duplication of work.  Class Counsel also did not adequately support all of the hourly fees requested.  As a result, the court could not cross-check the percentage-of-recovery method with the lodestar method of calculating fees to ensure that the requested fee amount was reasonable.  Additionally, Objector Helfand objected to the requested fee award on the basis that the hourly rates sought by HK's attorneys are too high and that HK duplicated the work of the other two law firms appointed Co-Lead Class Counsel, thus inflating the overall lodestar.  Helfand Obj. 4.[4]  The court ordered Class Counsel to submit supplemental evidence in support of their fee request that addressed how they organized and carried out their division of labor to ensure that there was no undue duplication of work.  The court also ordered Class Counsel to provide support for the hourly rates requested for one LCHB timekeeper; all BC timekeepers other than Chris Cormier and Warren Burns; and all HK timekeepers.  *See* Minute Order.

Class Counsel submitted a supplemental joint declaration in which they explain that they

_____

[4] Helfand did not object to the hourly rates or number of hours billed by LCHB and BC.  Helfand Obj. 5.

United States District Court
Northern District of California

1     implemented certain practices and procedures to "enable[ ] the effective and efficient prosecution

2     of the case" on behalf of the class.  [Docket No. 183 (Supp. Jt. Decl. of Kennedy, Geman,

3     Cormier, May 19, 2022) ¶ 6.]  These include using a "core leadership structure" consisting of one

4     senior lawyer from each firm to coordinate the workload and manage their own firm's staffing,

5     regular communication to discuss strategy and case management, assignment of specific tasks to

6     specific attorneys and/or firms, and delegation of assignments to other plaintiffs' counsel's firms.

7     *Id*. at ¶¶ 7-22.  Class Counsel also implemented a time and expense reporting protocol and a

8     litigation fund for case-related expenses.  *Id*. at ¶¶ 23-25.  The supplemental joint declaration also

9     addresses how the firms divided and handled tasks such as factual investigation, motion practice,

10    discovery, and mediation and eventual settlement.  *Id*. at ¶¶ 28-35.  Based on this supplemental

11    evidence, the court finds that the hours expended by Class Counsel are reasonable in light of the

12    work undertaken in this case and were not unduly duplicative and denies Objector Helfand's

13    objection on this point.

14           Turning to the hourly rates requested, LCHB's lodestar of $1,296,641 through January 25,

15    2022 reflects over 2,080 hours of work by eight timekeepers, including paralegals, a law clerk,

16    associates, and partners.  LCHB's billing rates for attorneys range from $465 for associates to

17    partner rates of $610, $850, and $1025.  They also include $370 per hour for a summer law clerk

18    and $395 per hour for a paralegal.  Jt. Decl. ¶¶ 62-70; Supp. Jt. Decl. Ex. 3 (Geman Decl., May 19,

19    2022) ¶ 3.

20           BC's lodestar of $1,286,262.50 through January 25, 2022 reflects over 1,600 hours of

21    work by eight timekeepers, including paralegals, associates, and partners.  It states that its billing

22    rates are $950 and $1050 per hour for partners; $500 to $600 per hour for associates; and hourly

23    rates of $325 for a paralegal and $425 for senior paralegals.  Jt. Decl. ¶¶ 73-75; Supp. Jt. Decl. Ex.

24    1 (Cormier Decl., May 19, 2022) ¶¶ 3-14.

25           The court has reviewed the supplemental evidence submitted in support of the claimed

26    rates by LCHB and BC, including the qualifications for the attorneys, paralegals, and summer law

27    clerk, as well as evidence that the same or similar rates have been awarded to these firms in

28    previous cases.  The court finds that the attorney rates are reasonable and in line with prevailing

United States District Court
Northern District of California

18

rates in this community for similar services performed by attorneys of comparable skill and experience. While the paralegal rates at both firms are high, similar rates have been awarded by courts in other class action litigation, including courts in this district. *See* Jt. Decl. ¶ 71; Geman Decl. ¶ 4; Cormier Decl. ¶¶ 9-13.

HK's fees are another matter. HK's lodestar through January 25, 2022 is $1,811,332.50, which is over $500,000 higher than each of the lodestars of the other two firms even though it billed fewer hours than the LCHB timekeepers.[5] All of HK's timekeepers are or were partners. Jt. Decl. ¶¶ 56-59; Supp. Jt. Decl. Ex. 2 (Kennedy Decl., May 19, 2022) ¶ 37. HK originally asserted that its billing rates were $825 per hour for two attorneys, Bret Hembd and Laura Seidl; $950 per hour for Shawn Kennedy; and $975 for Nicomedes Sy Herrera. Jt. Decl. ¶¶ 56-59. Its lodestar also included time charged by a fifth attorney, Andrew Purdy, at the rate of $950 per hour. Jt. Decl. ¶ 36, Ex. A. In the original joint declaration, Class Counsel state that these "customary rates . . . are consistent with prevailing rates in this District and have been billed to and paid by HK's hourly clients" and cite three cases in which they claim HK's rates have been approved. Jt. Decl. ¶ 60. As discussed at the hearing, the court was unable to locate any reference to the hourly rates charged by or awarded to HK attorneys in two of the three cases. In the third, *In re HP Printer Firmware Update Litig.*, No. 5:16-CV-05820-EJD, 2019 WL 2716287, at *3 (N.D. Cal. June 28, 2019), the court approved a $635 hourly rate for Herrera in 2019, which is $340 less than the hourly fee HK currently seeks for him. *See In re HP Printer Firmware Update Litig.*, Docket No. 122 at ECF p. 6 (setting out hourly rates requested).

In the supplemental joint declaration, Kennedy states that one of the three cases previously cited in support of the hourly rates was done so in error, and that in the other case, the court approved an hourly rate of $625 for Herrera as an associate in 2019. Kennedy Decl. ¶ 32. He asserts that the approved hourly rates for Herrera of $625 and $635 as an associate are consistent with his rate as a partner three years later at $975. He notes that a recent corporate client paid Herrera the hourly rate of $875 which the client acknowledged was a discount from his standard

---

[5] LCHB billed more hours than HK, but LCHB's lodestar is $514,691 less than HK's.

United States District Court
Northern District of California

1    rate of $975.  *Id*. at ¶¶ 30-32.  Kennedy acknowledges that "no Court has had occasion until now

2    to review the partner rates of its attorneys in connection with a class action fee petition."  *Id*. at ¶¶

3    5, 29-43.  Other than the two 2019 cases approving Herrera's significantly lower rates as an

4    associate, Kennedy does not cite any cases approving any rates previously requested by its

5    attorneys, whether at the partner or associate level.  Nor does HK proffer declarations by

6    comparable attorneys or a fee expert to support the reasonableness of its requested rates.

7         Kennedy now states that following a review of rates approved in similar cases in this

8    district, HK asks the court to assess the lodestar using a $625 hourly rate for Hembd instead of

9    $825 per hour.  *Id*. at ¶ 38.  HK also notes that if Seidl's rate were similarly decreased to $675, the

10   lodestar decreases by a total of $66,355 based on the reductions in the rates for both Hembd and

11   Seidl.  *Id*. at ¶¶ 43, 44.

12        Objector Helfand's objections to HK's billing rates are well-taken.  HK's requested rates

13   are concerning, particularly in light of its initial submission of misleading information to support

14   the requested rate for Herrera, its failure to cite cases in which any hourly rate was awarded to the

15   other four timekeepers, and the absence of any evidence by comparable lawyers attesting to the

16   reasonableness of the HK rates.  The court also notes HK's exclusive reliance on five partners to

17   litigate this case.

18        The rates requested by LCHB and BC are supported by evidence of rates awarded to those

19   firms in other cases, outcomes in other cases, and counsel's expertise and experience.  Having

20   compared their rates with those requested by HK and taking into account all of the evidence HK

21   ultimately submitted in support of its requested rates, the court concludes that the following hourly

22   rates for HK attorneys are appropriate: $825 for Kennedy; $850 for Herrera; $825 for Purdy; $625

23   for Hembd; and $675 for Seidl.  Based on these rates, HK's adjusted lodestar is $1,544,627.50.

24   The total overall adjusted lodestar is thus approximately $4,127,531.  Using the requested fee

25   award of $14,500,000, the multiplier increases from 3.29 to 3.51.

26        An examination of fee awards in comparable cases reveals significantly lower multipliers.

27   In privacy class actions *In re LinkedIn* and *Perkins*, courts awarded the 25% benchmark in

28   attorneys' fees.  *In re Linkedin*, 309 F.R.D. at 590-91; *Perkins*, 2016 WL 613255, at *15-17.

United States District Court
Northern District of California

1    However, the fee award in *In re LinkedIn* amounted to a negative multiplier, 309 F.R.D. at 590-91,

2    and the award in *Perkins* amounted to a 1.45 multiplier, far lower than the 3.51 multiplier in this

3    case based on adjusted HK rates.  *Perkins*, 2016 WL 613255, at *15.

4         Two other privacy class actions provide useful comparisons.  In *In re Lenovo Adware

5    Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *8 (N.D. Cal. Apr. 24, 2019), the court

6    awarded 30% of the settlement amount as attorneys' fees, which was a negative multiplier.  And in

7    *Valentine v. NebuAd Inc.*, No. C 08-05113 TEH (LB), 2011 WL 13244509, at *2-3 (N.D. Cal.

8    Nov. 21, 2011), the court awarded 30% of the settlement amount, which amounted to a .74

9    multiplier.  Class Counsel cite no other privacy class actions in the Ninth Circuit in which courts

10   awarded attorneys' fees based on the percentage-of-recovery method with lodestar multipliers

11   over the 1.45 multiplier in *Perkins*.  *See* Mot. 12-16.  The court's own research yielded only one:

12   *In re Facebook Biometric Information Privacy Litigation*, 522 F. Supp. 3d 617, 630-33 (N.D. Cal.

13   2021), which is readily distinguishable from this case.  In *In re Facebook*, the common fund was

14   $650 million.  Class counsel requested an award of $110 million, or 16.9% of the common fund.

15   The court found that the requested award "would . . . yield windfall profits for class counsel in

16   light of the hours spent on the case," and awarded $97,500,000, or 15% of the common fund.  The

17   lodestar multiplier was 4.71, which the court found was warranted in light of "[t]he results

18   obtained and the risks at trial."  *Id*. at 632-33 (quotation marks and citation omitted).

19        Based on the facts and circumstances of this case, the court's evaluation of the *Vizcaino*

20   factors including a review of comparable cases, and the lodestar cross-check, the court concludes

21   that a reasonable fee is 19% of the common fund, or $11,000,000, which is a 2.66 multiplier based

22   on the adjusted HK rates.  Accordingly, the court awards $11,000,000 to Class Counsel in

23   attorneys' fees.[6]

24

---

25   [6] Three objectors raise issues related to Class Counsel's request for attorneys' fees.  Rice argues
     that "a 30% lawyer fee" per person "amount[s] to a usurious fraction given the compensation each
26   Class Member will receive.  Rice Obj. 1.  Grosklaus asks the court to give "strong consideration"
     to Rice's "concerns regarding the amount of compensation for Class Counsel relative to the
27   expected compensation for Class Members."  Grosklaus Obj. 2.  As discussed above, the court
     awards Class Counsel 19% of the Settlement Fund, which is reasonable and warranted given the
28   results achieved for the class, the risk involved with this litigation, awards in other similar cases,
     and the lodestar cross-check.

United States District Court
Northern District of California

**B.      Expenses**

Class Counsel are also entitled to reimbursement of reasonable expenses.  Fed. R. Civ. P. 23(h).  Class Counsel seek reimbursement of $115,920.21 in litigation expenses.  Jt. Decl. ¶ 77.  These expenses include consultant fees; mediation fees; and other customary litigation expenses such as electronic research, filing fees, and photocopies.  *Id*. at ¶¶ 78, Table 3, Ex. D.  Having reviewed the evidence submitted in support of the request for expenses, the court finds the expenses were reasonably incurred and awards Class Counsel $115,920.21.

**C.      Service Awards**

Finally, Class Counsel requests service awards of $5,000 for each of the 11 Plaintiffs named in the CFAC, for a total of $55,000.  They explain that the Class Representatives spent considerable time and effort on this litigation, including time spent in interviews with Plaintiffs' counsel, communicating with counsel about the litigation and settlement, and participating in discovery.  Jt. Decl. ¶ 79.  Class Counsel submits declarations by each of the Class Representatives describing their participation in the litigation.  *Id*. at ¶ 80, Ex. E.

 "The request of $5,000 is reasonable as that amount is the presumptive incentive award in [the Northern District of California]."  *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-md-02777-EMC, 2019 WL 536661, at *9 (N.D. Cal. Feb. 11, 2019).  Accordingly, the court approves the requested service awards.

//

//

//

//

//

//

//

//

//

**IV.    CONCLUSION**

For the reasons set forth above, the court grants Plaintiffs' motion for final approval and grants in part Class Counsel's motion for attorneys' fees, costs, and service awards.

Within 21 days after the distribution of settlement funds and payment of attorneys' fees, Class Counsel shall file a Post-Distribution Accounting ("PDA") in accordance with the Northern District's Procedural Guidance for Class Action Settlements, *available at* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements.  The PDA must contain all information listed in the Guidance and shall be filed with the court and posted on the Settlement Website.  A final PDA must be filed after the distribution of all funds.

**IT IS SO ORDERED.**

Dated: July 20, 2022



Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California

23